# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| OUTSIDE THE BOX INNOVATIONS, LLC, d/b/a UNION RICH USA | ) ) ) |
| Plaintiff, | ) Civil Action No. ) 1:05-CV-2482-ODE |
| v. | ) ) |
| TRAVEL CADDY, INC., and ROOSTER PRODUCTS d/b/a THE ROOSTER GROUP | ) ) ) |
| Defendants. | ) **UNION RICH *ET AL.*'S** ) **AMENDED PROPOSED** ) **FINDINGS OF FACT AND** ) **CONCLUSIONS OF LAW** |
| —————————————————— | ) |
| TRAVEL CADDY, INC., | ) ) |
| Counter-Plaintiff, | ) ) |
| v. | ) ) |
| OUTSIDE THE BOX INNOVATIONS, LLC, d/b/a UNION RICH USA, | ) ) ) |
| UNION RICH PLASTIC FACTORY, LTD., | ) ) |
| BONAKA PLASTIC MANUFACTURING CO., LTD., and | ) ) ) |
| BONAKA LIMITED | ) ) |
| Counter-Defendants. | ) ) |
| —————————————————— | ) |

## **Table of Contents**

Note Regarding Citation Nomenclature ................................................................. **1**

I.   Findings of Fact ................................................................................... **2**

    A.   General Findings ................................................................... **2**

    B.   The Unenforceability of Travel Caddy's Patents-in-Suit .................... **5**

        1.   Unenforceability for Inequitable Conduct ................................. **5**

            (a)   Count I – Withholding Knowledge of the Related Litigation ...................................................................... **11**

            (b)   Count 2 - Withholding Knowledge of Material Prior Art References ...................................................... **24**

            (c)   Count 3 -- Travel Caddy's False Claim of Small Entity Status, and Payment of Small Entity Fees .......... **34**

            (d)   Counts 4-6 -- Travel Caddy's Fraudulent Claims of Inventorship, Fraudulent Claims of Application Priority, and Fraudulent Execution of Declaration ...... **40**

        2.   Unenforceability for "Patent Misuse" ...................................... **52**

    C.   Invalidity of '992 and '104 Patent Claims .......................................... **54**

        1.   Invalidity under 35 U.S.C. § 103 for Obviousness ................. **54**

        2.   Invalidity of Claims 5, 12, 23 and 30 of the '104 Patent under 35 USC §§ 112, 102(b) .................................................. **66**

II.   Conclusions of Law .......................................................................... **71**

## <u>Note Regarding Citation Nomenclature</u>

In order to aid the Court in understanding the citation nomenclature used hereinbelow, Union Rich does respectfully note the following:

(1) The conventional identifier "PX" refers to "Plaintiff's Exhibit", which identifier "PX" is followed by the appropriate Exhibit Number.

(2) The identifier "Tab", along with the number assigned thereto, refers to the tabbed excerpts taken from Plaintiff's Exhibits, which tabbed excerpts are contained within the white trial notebook submitted to the Court, and entered into evidence during the February 4-5, 2008 Evidentiary Hearing.  For example, the nomenclature "(PX-9/Tab 3)", would refer to Plaintiff's full Exhibit 9, a relevant excerpt of which is contained behind Tab 3 of the trial notebook.

## I.   **Findings of Fact.**

### A.   **General Findings.**

1.     Union Rich provides, *inter alia*, hardware products to retailers, including The Home Depot, U.S.A., Inc., and to others.  Of particular relevance to the present case are three (3) of Union Rich *et al.*'s tool bags, which bags are identified as (1) the Electrician's Bag Version I (PX-29), (2) Electrician's Bag Version II (PX-30), and (3) the Pro-Tool Bag (PX-27).

2.     Travel Caddy is an Illinois corporation with its principal place of business located at 700 Touhy Avenue, Elk Grove Village, Illinois 60007.

3.     Rooster Group is an entity of unknown form, and with its place of business located at 17280 N. Green Mountain Road, San Antonio, Texas, 78247.

4.     Jurisdiction in this Court is proper, as the present claim arises under the Patent Laws of the United States, Title 35 *et. seq.*  Venue is proper under 28 U.S.C. § 1391(b) and (c).  This Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. §§ 1331, and 1338(a).

5.     Travel Caddy is the assignee of the entire right, title and interest in and to United States Patent No. 6,823,992 ("the '992 patent") and United States Patent No. 6,991,104 ("the '104 patent").

6.     Travel Caddy charged Union Rich with infringement of the '992 and

'104 patents, and specifically accused Union Rich's three (3) bags – *i.e.*, the Electrician's Bag Version I, the Electrician's Bag Version II, and the Pro-Tool Bag (also referred to in this action as the "Plumber's Tote Bag").  Travel Caddy sought an action for, *inter alia*, patent infringement of the '992 and '104 patents, and further moved the Court for preliminary injunctive relief on the '104 patent.  Union Rich sought, *inter alia*, a declaration of non-infringement, invalidity and unenforceability of the '992 and '104 patents.

7.     On March 27, 2007, the Court denied Travel Caddy's Motion for a Preliminary Injunction, on the basis that Travel Caddy was unlikely to prevail on the merits, inasmuch as Union Rich's Electrician's Bag II and Pro-Tool Bag do not infringe the '992 and '104 patents-in-suit. (*See*, N.D.Ga. Doc. No. 392).

8.     On March 29, 2007, Travel Caddy filed an interlocutory appeal pursuant to 28 USC 1292(a), appealing the Court's denial of their preliminary injunction motion. (*See*, N.D.Ga. Doc. No. 393).

9.     On January 15, 2008, the United States Court of Appeals for the Federal Circuit affirmed this Court's ruling denying Travel Caddy's motion for a preliminary injunction, and further confirmed this Court's *Markman* rulings on the terms "between", "flexible….panel" and "fabric covered panel". (*See*, N.D.Ga. Doc. No. 473, certified copy of Federal Circuit Judgment).

10.     On January 28, 2008, Travel Caddy petitioned the Federal Circuit for a panel rehearing, which was subsequently denied on February 12, 2008.

11.     On August 7, 2007, the Court granted in material part Union Rich's Motion for Summary Judgment of Non-infringement, and specifically ruled that Union Rich's Electrician's Bag II and Pro-Tool Bag do not infringe (either literally or under the doctrine of equivalents) any of the claims of the '992 and '104 patents-in-suit. (*See*, N.D.Ga. Doc. No. 412).

12.     Inasmuch as Union Rich has conceded claim coverage of their Electrician's Bag I, the Court has planned to schedule a jury trial on the issues of Union Rich's claim of non-infringement of the Electrician's Bag I on the basis of extraterritorial activities, and further on the issue of Travel Caddy's alleged count for "provisional rights", pursuant to the provisions of 35 U.S.C. § 154(d), and issues related to the foregoing. (*Id.*).

13.     On February 4-5, 2008, the Court held a non-jury evidentiary hearing on the subjects of Union Rich's counts of inequitable conduct leading to unenforceability, and patent invalidity, both in regard to the '992 and '104 patents-in-suit.

14.     In sum, Union Rich has contended that the '992 and '104 patents are unenforceable, and specifically on the grounds of any one or a combination of

Travel Caddy's six (6) separate acts of alleged inequitable conduct before the United States Patent and Trademark Office.

15.     Union Rich has still further contended that all the claims of the '992 and '104 patents are invalid, and specifically on any one or a combination of the separate and further alleged grounds of (1) invalidity for obviousness pursuant to the provisions of 35 U.S.C. § 103, (2) invalidity for failure to comply with the requirements of 35 U.S.C. § 112 regarding "written description", and (3) invalidity for prior public use or "on-sale" activities, pursuant to the provisions of 35 U.S.C. § 102(b).

16.     The Court is now prepared to consider evidence and legal authority on the issues concerning inequitable conduct and patent invalidity, both in regard to Travel Caddy's '992 and '104 patents-in-suit.

### B.     The Unenforceability of Travel Caddy's Patents-in-Suit

#### 1.     Unenforceability for Inequitable Conduct

17.     All patent applicants have an affirmative duty to prosecute patents in the PTO with the utmost candor and good faith.  This duty of candor extends throughout the entire prosecution history of the patent. *See*, *Nilssen v. Osram Sylvania, Inc.*, 440 F. Supp. 2d 884, 899 (D. Ill. 2006), *aff'd* 504 F.3d 1223 (Fed. Cir. 2007); *37 C.F.R. § 1.56(a) (1996)*; *Critikon, Inc. v. Becton Dickinson Vascular*

*Access*, 120 F.3d 1253, 1256 (Fed. Cir. 1997); *Brasseler U.S.A., I., L.P. v. Stryker Sales Corp.*, 93 F. Supp. 2d 1255 (D. Ga. 1999).

18.    Inequitable conduct occurs when a patentee breaches this duty to the USPTO -- this duty of candor, good faith and honesty -- and as such inequitable conduct may include affirmative misrepresentations of material fact, withholding of material information, or the submission of false material information, together with an intent to mislead or deprive the PTO by way of this conduct. *See*, *Nilssen v. Osram Sylvania, Inc.*, 504 F.3d 1223, 1229 (Fed. Cir. 2007); *Critikon, Inc. v. Becton Dickinson Vascular Access*, 120 F.3d 1253 (Fed. Cir. 1997).

19.    In that regard, the inequitable conduct analysis consists of two steps -- the first of which is to determine whether the conduct meets a threshold level of materiality and intent to mislead, and, second, a weighing of the materiality and intent in light of all the circumstances to determine whether the applicant's conduct is sufficiently culpable to render the patent unenforceable. *See*, *Nilssen v. Osram Sylvania, Inc.*, 440 F. Supp. 2d 884, 899 (D. Ill. 2006), *aff'd* 504 F.3d 1223 (Fed. Cir. 2007).

20.    On the element of materiality, information is considered material under the reasonable examiner standard. *See*, *Nilssen v. Osram Sylvania, Inc.*, 440 F. Supp. 2d 884, 899 (D. Ill. 2006), *aff'd* 504 F.3d 1223 (Fed. Cir. 2007).  Would a

reasonable examiner have considered the information important in determining whether to allow the application to issue as a patent? *Id.*

21.     As the Federal Circuit stated in the case of *Cargill, Inc. v. Canbra Foods, Ltd.*, 476 F.3d 1359, 1364 (Fed. Cir. 2007):

> "The materiality element of inequitable conduct was recently clarified in *Digital Control Inc. v. Charles Machine Works, 437 F.3d 1309 (Fed. Cir. 2006)*. In that decision, we explained that the standard for materiality set forth in the current version of PTO *Rule 56*, *See 37 C.F.R. § 1.56(b)(2006)*, did not supplant the earlier "reasonable examiner" standard, *See 37 C.F.R. § 1.56(a) (1991)*. *Digital Control, 437 F.3d at 1316*; *See also Impax Labs., 468 F.3d at 1374*. Rather, "if a misstatement or omission is material under the new *Rule 56*, it is material. Similarly, if a misstatement or omission is material under the 'reasonable examiner' standard..., it is also material." *Digital Control, 437 F.3d at 1316*.

The present version of *Rule 56* states that:

> [I]nformation is material to patentability when it is not cumulative to information already of record or being made of record in the application, and
>
>> (1) It establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim, or
>>
>> (2) It refutes, or is inconsistent with, a position the applicant takes in:
>>
>> (i) Opposing an argument of unpatentability relied on by the Office, or
>>
>> (ii) Asserting an argument of patentability.
>
> A prima facie case of unpatentability is established when the information compels a conclusion that a claim is

- 7 -

> unpatentable under the preponderance of evidence, burden-of-proof standard, giving each term in the claim its broadest reasonable construction consistent with the specification, and before any consideration is given to evidence which may be submitted in an attempt to establish a contrary conclusion of patentability.
>
> *37 C.F.R. § 1.56(b) (2006).* Under the earlier "reasonable examiner" standard, "information is material where there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent." *37 C.F.R. § 1.56(a) (1991).*" *Id.* at 1364.

22.    Regarding the element of intent, the prevailing law is very clear. Direct evidence of intent to mislead, to deprive, or to deceive is rarely if ever available, and, as such, intent rarely can be, and need not be, proven by direct evidence. *See*, *Nilssen v. Osram Sylvania, Inc.*, 440 F. Supp. 2d 884, 899 (D. Ill. 2006), *aff'd* 504 F.3d 1223 (Fed. Cir. 2007); *J.P. Stevens & Co. v. Lex Tex, Ltd.,* 747 F.2d 1553, 1559-60 (Fed. Cir. 1985); *Cargill, Inc. v. Canbra Foods, Ltd.*, 476 F.3d 1359 (Fed. Cir. 2007); *Impax Labs., Inc. v. Aventis  Pharms. Inc.,* 468 F.3d 1366, 1374 (Fed. Cir. 2006).  Instead, intent may be inferred from the facts and circumstances surrounding the applicant's conduct. *Id.*  To that extent, intent may be inferred where a patent applicant <u>knew</u> -- <u>or should have known</u> -- that the withheld information would be material to the patent office's consideration of the patent application. *Nilssen at 909; Driscoll v. Cebalo,* 731 F.2d 878, 885 (Fed. Cir.

1984); *Critikon, Inc. v. Becton Dickinson Vascular Access*, 120 F.3d 1253, 1256 (Fed. Cir. 1997); *Monsanto Co. v. Bayer Bioscience N.V.*, 2008 U.S. App. LEXIS 1409 (Fed. Cir. 2008).

23.   Finally, and in understanding the relationship or dynamic between materiality and intent, the prevailing law is again quite clear.  The relationship between materiality and intent is one of inverse proportionality.  Specifically, where a higher showing of materiality has been demonstrated, the requisite finding of intent may be lower. *Nilssen v. Osram Sylvania, Inc.*, 440 F. Supp. 2d 884, 899 (D. Ill. 2006), *aff'd* 504 F.3d 1223 (Fed. Cir. 2007); *Critikon, Inc. v. Becton Dickinson Vascular Access*, 120 F.3d 1253, 1256 (Fed. Cir. 1997); *Akzo N.V. v. United States Int'l Trade Comm'n*, 808 F.2d 1471 (Fed. Cir. 1986*)*; *Origin Medsystems, Inc. v. General Surgical Innovations, Inc.*, 1999 U.S. App. LEXIS 16180 (Fed. Cir. 1999).

24.   No single factor or combination of factors can be said always to require an inference of intent to mislead.  *Nilssen v. Osram Sylvania, Inc.*, 440 F. Supp. 2d 884, 909 (D. Ill. 2006), *aff'd* 504 F.3d 1223 (Fed. Cir. 2007).  Yet, a patentee facing a high level of materiality and clear proof that it knew or should have known of that materiality, can expect to find it difficult to establish "subjective good faith" sufficient to prevent the drawing of an inference of intent to

mislead. *Id.*  A mere denial of intent to mislead (which would defeat every effort to establish inequitable conduct) will not suffice in such circumstances. *Id; and see, Critikon, Inc. v. Becton Dickinson Vascular Access*, 120 F.3d 1253 (Fed. Cir. 1997); *GFI, Inc. v. Franklin Corp.*, 265 F.3d 1268 (Fed. Cir. 2001); *FMC Corp. v. Manitowoc Co.*, 835 F.2d 1411, 1415 (Fed. Cir. 1987).

25.    In short, the prevailing law states that it is axiomatic that close cases should be resolved by disclosure, not unilaterally by the applicant. *See*, *Nilssen v. Osram Sylvania, Inc.*, 440 F. Supp. 2d 884, 909 (D. Ill. 2006), *aff'd* 504 F.3d 1223 (Fed. Cir. 2007); *Labounty Mfg., Inc. v. United States Int'l Trade Comm'n,* 958 F.2d 1066, 1076, 22 U.S.P.Q.2D (BNA) 1025, 1033 (Fed. Cir. 1992); *GFI, Inc. v. Franklin Corp.*, 265 F.3d 1268, 1274 (Fed. Cir. 2001).  This sentiment is also repeatedly reflected in the Manual of Patent Examining Procedure (MPEP), which, although it does not have the force and effect of law, is well known to those registered to practice in the PTO and reflects the presumptions under which the PTO operates. *See Refac Int'l Ltd. v. Lotus Development Corp.*, 81 F.3d 1576, 1584 n.2, 38 U.S.P.Q.2D (BNA) 1665, 1671 n.2 (Fed. Cir. 1996). *See*, *Critikon, Inc. v. Becton Dickinson Vascular Access*, 120 F.3d 1253, 1257 (Fed. Cir. 1997).  That rule is drawn from the policy that applicants should submit information for consideration by the USPTO in applications <u>rather than making and relying on</u>

<u>their own determinations of materiality</u>.  *See*, *Cargill, Inc. v. Canbra Foods, Ltd.*, 476 F.3d 1359 (Fed. Cir. 2007).

       **(a)    Count I – Withholding Knowledge of the Related Litigation:**

26.    Section 2001.06(c) of the MPEP provides:

> Where the subject matter for which a patent is being sought is or has been involved in litigation, the existence of such litigation and any other material information arising therefrom must be brought to the attention of the U.S. Patent and Trademark Office. Examples of such material information include evidence of possible prior public use or sales, questions of inventorship, prior art, allegations of "fraud," "inequitable conduct," and "violation of duty of disclosure." Another example of such material information is any assertion that is made during litigation which is contradictory to assertions made to the examiner. *Environ Prods., Inc. v. Total Containment, Inc.*, 43 USPQ2d 1288, 1291 (E.D. Pa. 1997). Such information might arise during litigation in, for example, pleadings, admissions, discovery including interrogatories, depositions, and other documents and testimony.

MPEP 2001.06(c) Information from Related Litigation [R-2].

27.    Federal Circuit law is settled on the language of MPEP §2001.06(c) regarding disclosure of related litigation. Specifically, the Federal Circuit has stated that it is clear from the language of §2001.06(c) that the existence of the litigation itself is material information that an examiner needs to have. *Nilssen v. Osram Sylvania, Inc.*, 440 F. Supp. 2d 884, *aff'd* 504 F.3d 1223 (Fed. Cir. 2007); *Critikon, Inc. v. Becton Dickinson Vascular Access*, 120 F.3d 1253, 1257 (Fed. Cir.

1997); *Daimler-Chrysler AG v. Feuling Advanced Techs., Inc.*, 276 F. Supp. 2d 1054 (D. Cal. 2003).  Thus, related litigation is *per se* material information covered by the duty of disclosure.  *Id.*  It is material information *per se,* because it signals the examiner that other material information relevant to patentability may become available through the litigation proceedings. *Id.*

28.    As such, where there has been a knowing and intentional failure to call existing litigation to the attention of the USPTO, courts have found inequitable conduct. *See*, *Nilssen v. Osram Sylvania, Inc.*, 440 F. Supp. 2d 884, *aff'd* 504 F.3d 1223 (Fed. Cir. 2007); *Critikon, Inc. v. Becton Dickinson Vascular Access*, 120 F.3d 1253, 1257 (Fed. Cir. 1997); *Daimler-Chrysler AG v. Feuling Advanced Techs., Inc.*, 276 F. Supp. 2d 1054 (D. Cal. 2003).

29.    The '104 patent application was filed on November 4, 2004, and did not issue until January 31, 2006. ('104 patent (PX-9/Tab 3)).  The present litigation was filed on September 23, 2005. (N.D.Ga. Doc. Nos. 1 (Complaint), 9 (Return of Service for Rooster (perfected September 29, 2005), and 10 (Return of Service for Travel Caddy (perfected October 11, 2005)).  Thus, the litigation was co-pending with the '104 underlying patent application.

30.    By his own admission, the Court finds that Travel Caddy's counsel, Mr. Nelson, was fully advised, fully aware and fully informed of his duty under

MPEP § 2001.06(c), but made the knowing and intentional choice to withhold his knowledge of the litigation from the USPTO based upon his personal "judgment" that "[t]he litigation was not material". (Excerpt from Deposition Transcript of Jon O. Nelson, pp. 170-172 (PX-52/Tab 2)).  Travel Caddy's counsel, Mr. Nelson, further admitted that, had he called the litigation to the attention of the USPTO, the USPTO could have made its own determination on the subject of materiality of the litigation. (*See*, Hearing Transcript, p. 290).  The obverse is also true.

31.    The Court further finds that the personal "judgment" of Travel Caddy's counsel, Mr. Nelson, is contrary to the prevailing law that mandates that related litigation is material *per se*, and as such is covered by the duty of disclosure required by 37 CFR 1.56, and MPEP §2001.06(c).  In that regard, the Court further notes that Travel Caddy has argued that the duty to disclose related litigation is somehow dependent upon counsel's personal opinion as to "materiality". However, the requirement to disclose related litigation is absolute.  The Court thus finds that Mr. Nelson (and thus Travel Caddy) has breached this duty.

32.    The Court finds that the present litigation is material *per se* because it involved the same subject matter as the then-pending '104 patent application, inasmuch as the '992 patent (of which the '104 is a continuation patent) was already the subject matter of this litigation. (*See*, *for example*, Travel Caddy's

Answer and Counterclaim, N.D.Ga. Doc. No. 11, filed November 11, 2005); *and* s*ee*, '992 patent (PX-8/Tab 4); '104 patent and related file history (PX-9/Tab 5 (regarding the double patenting rejection of the '104 underlying patent application in view of the prior issued '992 patent, and which rejection is based upon the "same invention" type and commonly claimed subject matter)), and (PX-9/Tab 6 (Travel Caddy's subsequent terminal disclaimer filing)).

33.    Yet additionally, the Court finds that the materiality of the present litigation was readily apparent because the validity of the claimed subject matter of the '992 patent was directly in question. (*See*, Joint Preliminary Report and Discovery Plan, N.D.Ga. Doc. No. 22, filed December 9, 2005, p. 2 (PX-12/Tab 8)).

34.    The Court also finds that Travel Caddy's counsel had caused his name to be signed to this Joint Preliminary Report and Discovery Plan (N.D.Ga. Doc. No. 22, p. 10), and in which Travel Caddy's counsel had thus (a) represented to the Court that validity of the '992 patent would be an issue in this litigation, and (b) further confirmed his knowledge of the presence of this issue in the case. *See*, *Nilssen v. Osram Sylvania, Inc.*, 440 F. Supp. 2d 884, *aff'd* 504 F.3d 1223 (Fed. Cir. 2007); *Critikon, Inc. v. Becton Dickinson Vascular Access*, 120 F.3d 1253,

1257 (Fed. Cir. 1997); *Daimler-Chrysler AG v. Feuling Advanced Techs., Inc.*, 276 F. Supp. 2d 1054 (D. Cal. 2003).

35.     In that regard, and as measured from the December 9, 2005 filing date of the Joint Preliminary Report and Discovery Plan, to the January 31, 2006 issuance date of the '104 patent, Mr. Nelson had approximately two (2) months in which to disclose the related litigation to the PTO during prosecution of the '104 underlying patent application, which Mr. Nelson testified was "adequate time" (*see*, Hearing Transcript, p. 286).   Hence, the Court finds that two months was sufficient time in which counsel could have, and should have, fulfilled his uncompromising duty to disclose this related litigation.   Accordingly, the Court further finds that Mr. Nelson (and thus Travel Caddy) breached his duty to the USPTO.

36.     The Court notes that Travel Caddy contends that the inclusion of legal issues concerning patent validity/invalidity within a Joint Preliminary Report and Discovery Plan ("Joint Report") are somehow "boilerplate".   (Hearing Transcript 242, lines 8 *et seq*.).   However, the Court is intimately familiar with the form document constituting the Joint Report, and notes that the subject of patent validity/invalidity is **not** a part of the Court's form.   Instead, the citation or reference to legal issues concerning patent validity/invalidity is an intentional

- 15 -

communication to the Court, placed on the form document by the parties submitting the Joint Report to the Court.  In that regard, Mr. Nelson admitted that he attended the Rule 26(f) conference amongst counsel (*id*.) on December 8, 2006, and that he further read and approved of the Joint Report, and thus caused his signature to be added to the document as an accurate representation to the Court regarding the content of counsels' Rule 26(f) conference. (*Id*.).  Accordingly, the Court finds that Travel Caddy, and its counsel Mr. Nelson, are bound by their representations made to the Court, and that Mr. Nelson was thus fully aware, at least as early as December 8, 2005, that the issues of the case included a "determination of validity of the '992 claims". (*See*, Joint Preliminary Report and Discovery Plan, N.D.Ga. Doc. No. 22, filed December 9, 2005, p. 2 (PX-12/Tab 8)).

37.    The Court further finds that Travel Caddy's counsel had fully intended to (and, of course, ultimately did) inject the '104 patent into this litigation -- and within a mere <u>eight (8) days</u> following the issuance thereof. (*See*, Defendants' Motion for Leave to File Second Amended Answer and Counterclaim, N.D.Ga. Doc. No. 32-1, pp. 2, 3, *and see* Doc. No. 32-4, p. 5, filed February 8, 2006 (PX-44/Tab 7)).  However, and despite these facts, Travel Caddy's counsel chose to withhold from the USPTO knowledge of this related litigation during the

pendency of the '104 patent application, and the material information arising therefrom.

38.   The Court finds that the materiality of the litigation is further established by the facts and events that occurred in the USPTO in connection with Travel Caddy's newest continuation patent application -- U.S. Application Serial No. 11/340,261 -- which '261 continuation application claims priority to Travel Caddy's '104 patent, '992 patent, and the original provisional patent application filing (Serial No. 60/365,966, filed March 20, 2002).  In particular, it is in this '261 application that Travel Caddy's counsel did, and for the first time, disclose to the USPTO this related litigation.

39.   At the outset, the Court does note that the Examiner in the '261 continuation application (i.e., Kurt Fernstrom), was also the Examiner in the '992 and '104 underlying patent applications.  Additionally, Examiner Fernstrom had issued (just as he did in the '104 underlying patent application) a double patenting rejection of the '261 continuation claims in view of the issued '104 patent claims. Again, such a double patenting rejection, for all practical purposes, signifies that the claims of the '261 continuation application are claiming the same common subject matter as that claimed in the issued '104 patent. (*See*, '261 patent and related file history (PX-10/Tab 9 (regarding the double patenting rejection of the

'261 patent application in view of the prior issued '104 patent, and which rejection is based upon the "same invention" type and commonly claimed subject matter, and in which the Examiner stated: "Furthermore, there is no apparent reason why applicant was prevented from presenting claims corresponding to those of the instant ['261] application during prosecution of the application which matured into a patent [i.e., the 104 patent]." (explanation added.)), *and* (PX-10/Tab 10 (Travel Caddy's subsequent terminal disclaimer filing)).

40.    The Court notes that the Examiner's double-patenting rejection in the '261 application was made prior to ever receiving from Travel Caddy's counsel information concerning the litigation in the '261 continuation case.

41.    In that regard, the Court turns now to the facts surrounding Travel Caddy's counsel's disclosure of the related litigation, and the additional material information that arose therefrom.  (*See*, *e.g.*, Information Disclosure Statement of October 17, 2006, from '261 file history (PX-10/Tab 11)).   In particular, the litigation and additional material information disclosed to the USPTO included, *inter alia*, Union Rich's LPR 4.3 Invalidity Contentions, and material prior art references uncovered by Union Rich and presented as invalidating prior art references said Invalidity Contentions. (*Id.*).

- 18 -

42.   In that regard, it is apparent, from the '261 file history, that the Examiner carefully considered, cited and relied upon these very same material prior art references (and specifically, Ziff, Hoover, Huang, Baum, Christman, and Kornblatt), and Union Rich's Invalidity Contentions, in examining and rejecting the claims of the '261 continuation application pertaining to the very **same invention** claimed in Travel Caddy's '992 and '104 patents. (*See*, Office Action of January 29, 2007, from '261 file history (PX-10/Tab 12), *and see* Plaintiffs' Amendment & Third Supplement to LPR 4.3 Invalidity Contentions, N.D.Ga. 148-1 (PX-42/Tab 13)).   In fact, it is apparent that the Examiner adopted many of Union Rich's invalidity positions presented in Union Rich's LPR 4.3 Invalidity Contentions. (*Id.*).

43.   Accordingly, the Court further finds that it is precisely this type of material information -- here Union Rich's Invalidity Contentions  (and the material prior art references cited therein) -- that the Federal Circuit has referred to as "material information" that may become available through the litigation proceedings. *See*, *Nilssen v. Osram Sylvania, Inc.*, 440 F. Supp. 2d 884, *aff'd* 504 F.3d 1223 (Fed. Cir. 2007); *Critikon, Inc. v. Becton Dickinson Vascular Access*, 120 F.3d 1253, 1257 (Fed. Cir. 1997); *Daimler-Chrysler AG v. Feuling Advanced Techs., Inc.*, 276 F. Supp. 2d 1054 (D. Cal. 2003).

44.     Thus, the Court further finds that, had Travel Caddy's counsel disclosed the present related litigation to the USPTO during prosecution of the '104 patent application, such disclosure would have signaled the Examiner that such additional material information would be forthcoming.

45.     On that further basis, the Court finds that, had Travel Caddy disclosed the present related litigation to the USPTO during prosecution of the '104 patent application, the Examiner in the underlying '104 patent application would have had an equal opportunity to examine Union Rich's LPR 4.3 Invalidity Contentions, and the material prior references cited therein, and would have thus had the opportunity to have rejected the claims of the then pending '104 patent application. Unfortunately, and unlawfully, Travel Caddy's counsel did not provide the Examiner in the '104 patent with an opportunity to consider this material information arising from the litigation.  (*See*, PX-52/Tab 2).

46.     The Court addresses now the issue of intent.  In addition to his public representations, Travel Caddy's counsel has testified as to having some 40 years of practice as a patent and trial lawyer, with many intellectual property cases within his experience, and having filed several thousand patent applications.  (*See*, PX-46/Tab 15 (Biography of Jon O. Nelson, stating, *inter alia*, Mr. Nelson's "extensive litigation related to patents…", his role as "lead trial counsel in a

number of cases…", and further identifying Mr. Nelson's listing "in Euromoney's recent 'Guide to the World's Leading Patent Law Experts.'"; *and see*, Transcript from February 4, 5, 2008, Evidentiary Hearing, p. 195, lines 5-7; p. 199).  He has testified and admitted to knowing his duties before the PTO, has fully admitted to understanding his duties of disclosure, and is fully advised on the law concerning his duties of disclosure and the consequences of withholding material information from the USPTO. (*See*, PX-52/Tabs 2, 31 (excerpts from Deposition of Jon O. Nelson, pp. 170-172, 112-113, respectively; *and see*, *e.g.*, Hearing Transcript, p. 210, lines 14-17; p. 211, lines 13-15)).  Indeed, it is apparent that he is fully advised on the law concerning inequitable conduct – and in fact has himself asserted inequitable conduct in a multiplicity of cases. (*See*, PX-47/Tab 16). Moreover, the Court has ruled that "Mr. Nelson has expertise in patent law." (Hearing Transcript, p. 207, lines 21-22).

47.    In fact, and as Mr. Nelson's legal experience and practice does confirm (and as he testified on cross-examination), issues of invalidity are known to be present in a substantial percentage of patent cases. (*See*, Hearing Transcript, p. 285).  In fact, in Mr. Nelson's letter of May 19, 2005 to Ms. Mandy Decker, counsel for the Home Depot (DX-140), Mr. Nelson had himself raised the issues of patent validity and/or unenforceability. (*See*, Hearing Transcript, p. 287).

48.     Accordingly, and setting aside the fact that Travel Caddy's counsel had (a) represented to the Court that validity of the '992 patent would be an issue in this litigation, and (b) further confirmed his knowledge of the presence of this issue in the case (*see*, PX-12/Tab 8), the Court finds, based on the facts and circumstances of Travel Caddy's counsel's level of expertise, that Travel Caddy's counsel knew or should have known that issues of invalidity and inequitable conduct would likely also be present in this case.

49.     Stated differently, the Court finds that Travel Caddy's counsel, charged with that level of expertise, knew what the natural, probable and foreseeable consequences of his actions would be in consciously choosing to withhold from the PTO his knowledge of the related litigation -- i.e., that the PTO would be deprived of (a) knowledge of this related, and thus *per se* material, litigation, and (b) any and all information concerning or arising from this related litigation.

50.     In that regard, the Court does find it both disconcerting and inconsistent that Travel Caddy's counsel did not, in his judgment, believe the litigation to be sufficiently material to warrant disclosure to the PTO during pendency of the '104 patent application, but did believe the '104 patent to be of such overwhelming materiality, so as to inject the '104 patent into this litigation

(and within a mere eight (8) days from issuance), and to file shortly thereafter a motion for a preliminary injunction based on the '104 patent.

51.     Travel Caddy's counsel is guided by his some 40 years of experience as a patent attorney and a trial lawyer -- some 40 years of experience involving a significant number of patent and litigation cases.

52.     Travel Caddy's counsel was guided by his some 40 years of continued reference and operation under the rules and laws governing his duty of disclosure before the USPTO.

53.     Accordingly, and because Travel Caddy's counsel was faced with a high level of materiality (here, the materiality of the related litigation) and clear proof that <u>he knew or should have known</u> of that materiality, the Court finds that Travel Caddy's counsel cannot establish "subjective good faith" sufficient to prevent the drawing of an inference of intent to mislead. *See*, *Nilssen v. Osram Sylvania, Inc.*, 440 F. Supp. 2d 884, 909 (D. Ill. 2006), *aff'd* 504 F.3d 1223 (Fed. Cir. 2007); *Critikon, Inc. v. Becton Dickinson Vascular Access*, 120 F.3d 1253 (Fed. Cir. 1997)*; GFI, Inc. v. Franklin Corp.*, 265 F.3d 1268 (Fed. Cir. 2001) (A mere denial of intent to mislead (which would defeat every effort to establish inequitable conduct) will not suffice in such circumstances.); *FMC Corp. v. Manitowoc Co.*, 835 F.2d 1411, (Fed. Cir. 1987).

54.     In that regard, Travel Caddy sought to excuse Travel Caddy's failure to disclose the related litigation by arguing that evidence of Travel Caddy's good faith may be demonstrated with reference to Mr. Nelson's letters to Union Rich's and Home Depot's counsel, in which Mr. Nelson allegedly sought a listing of prior art references.  However, Mr. Nelson admitted in his testimony that it was <u>Travel Caddy</u>, and not Union Rich, the Home Depot, or anyone else, who had the duty to cite material information to the USPTO.  (*See*, Hearing Transcript, p. 287).

55.     Moreover, and for the reasons expressed, *infra* (regarding, for example, non-inventorship of the Figs. 10 and 11 bag embodiment, and the late-claiming activity of Claims 5, 12, 23 and 30 of the '104 patent), the Court finds that the overall impact of Mr. Nelson's (and thus Travel Caddy's) failure to disclose the related litigation, was that Travel Caddy had inequitably received the '104 patent.  Indeed, had Travel Caddy **<u>not</u>** received the '104 patent, then Travel Caddy would **<u>not</u>** have had any vehicle upon which to premise its motion for a preliminary injunction, the subsequent appeal, and the panel rehearing -- thus, significantly reducing the expense and burden on the parties, and the Court.

### (b)    Count 2 - Withholding Knowledge of Material Prior Art References.

56.     37 C.F.R. § 1.56 provides:

Duty to disclose information material to patentability.

(a)     A patent by its very nature is affected with a public interest. The public interest is best served, and the most effective patent examination occurs when, at the time an application is being examined, the Office is aware of and evaluates the teachings of all information material to patentability. Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability as defined in this section. The duty to disclose information exists with respect to each pending claim until the claim is cancelled or withdrawn from consideration, or the application becomes abandoned. Information material to the patentability of a claim that is cancelled or withdrawn from consideration need not be submitted if the information is not material to the patentability of any claim remaining under consideration in the application. There is no duty to submit information which is not material to the patentability of any existing claim. The duty to disclose all information known to be material to patentability is deemed to be satisfied if all information known to be material to patentability of any claim issued in a patent was cited by the Office or submitted to the Office in the manner prescribed by §§ 1.97(b)-(d) and 1.98. However, no patent will be granted on an application in connection with which fraud on the Office was practiced or attempted or the duty of disclosure was violated through bad faith or intentional misconduct.

57.     During prosecution of the '992 and '104 patents, Travel Caddy and its counsel had an uncompromising duty to disclose to the USPTO all material prior-art references of which they had knowledge. (*See*, *e.g.*, 37 CFR § 1.56).

58.     In that regard, Travel Caddy sought to excuse its failure to disclose material prior art by arguing that its counsel, Mr. Nelson, had requested that the Home Depot's counsel, Ms. Decker, supply a listing of prior art.  However, Mr. Nelson admitted in his testimony that it was Travel Caddy, and not Home Depot's

counsel, who had the duty to cite material prior art to the USPTO.  (*See*, Hearing Transcript, p. 287).

59.    U.S. Patent No. 6,595,687 (the '687 patent) issued on July 22, 2003, and lists Donald E. Godshaw (President of Travel Caddy) and Andrezj Redzisz (named inventor on '992 and '104 patents) as inventors, and further lists Travel Caddy, Inc. as the Assignee. (PX-11/Tab 18).  The prosecuting attorney for the '687 patent was Jon O. Nelson.  The filing date of the underlying '687 patent application is September 13, 2001, and the publication date is December 5, 2002. (*Id*.).  Further, the '687 patent issued on July 22, 2003. (*Id*.).  Additionally, a review of the '687 file wrapper history discloses that the prior-art references listed on the face of the '687 patent were first cited by the Examiner in a September 26, 2002 Office Action.  (PX-11/Tab 19 (*see*, Notice of References Cited)).

60.    Inasmuch as '992 underlying patent application was filed on March 20, 2003 and did not issue until November 30, 2004, the '687 underlying patent application was pending and being prosecuted **at the very same time** that the '992 underlying patent application was pending and being prosecuted by Travel Caddy and its counsel, Mr. Nelson.

61.    Consequently, and as discussed *infra*, the material subject matter of the '687 patent application, and the material prior art references cited therein, were

right in front of Travel Caddy and its counsel while the '992 patent application was being prosecuted, and thus were still further known to Travel Caddy and its counsel during prosecution of the later filed '104 underlying patent application.

62.    In fact, and as measured from the July 22, 2003 issuance date of the '687 patent to the November 30, 2004 issuance date of the '992 patent, Travel Caddy and its counsel had **more than sixteen (16) months** to disclose the '687 patent/application and the material references cited therein, to the USPTO during prosecution of the '992 underlying patent application -- but did not do so. Similarly, and again as measured from the July 22, 2003 issuance date of the '687 patent to the January 31, 2006 issuance date of the '104 patent, Travel Caddy and its counsel had **more than 2½ years** to disclose the '687 patent/application and the material references cited therein, to the USPTO during prosecution of the '104 underlying patent application -- but again, did not do so.

63.    The '687 patent is drawn to a "storage and carrying case" (PX-11/Tab 18), as are the '992 and '104 patents (PX-8/Tab 4, PX-9/Tab 3, respectively). The '687 patent teaches a single, continuous closed-looped binding, as do the '992 and '104 patents. (*See*, e.g. Fig. 1, '687 patent; PX-48/Tab 21). The '687 patent teaches a single continuous closed-looped binding configured over the bag panels identically to the single continuous looped-binding described and claimed in the

'992 and '104 cases. (*See, e.g.*, '992 and '104 patents, Col. 3, lines 36-65, and Fig. 1; *and see*, PX-48/Tab 21). This single continuous closed-looped binding is described in the '992 and '104 patents as being "an important aspect of the invention". ('992 and '104 patents, Col. 3, line 36).  Although Travel Caddy has argued that the identity of the items to place into the '687 bag is supposedly important, the Court finds that the <u>structure</u> of the '687 bag is of far greater pertinency to the teaching of the '687 bag to the Public. (*See*, Hearing Transcript, p. 283).

64.     The prior art reference to Ziff, cited in the '687 patent application, and also known to Travel Caddy and its counsel during prosecution of the '992 and '104 patent applications, also teaches this single continuous closed-loop binding of the '992 and '104 patents-in-suit.  (*See*, *e.g.*, Ziff, Col. 1, lines 65-70, and Fig. 1 (PX-1/Tab 20); *and see* PX-48/Tab 21).

65.     Still further, and like the '992 and '104 patents, both the '687 and the Ziff references teach soft-sided or fabric covered panels comprising an intermediate rigid sheet or board of plastic. (*See*, *e.g.*, '687, Col. 2, lines 49-55; Ziff, Col. 2, lines 8-15, 18-22, and Col. 3, lines 4-7).

66.     Yet further, and like the '992 and '104 patents, the Ziff reference also teaches reinforcing rods sewn into and enclosed within the fabric layers of the

upper margins of the front and back panels of the bag.  (*See*, *e.g.*, Ziff, Col. 2, lines 68-71, and Col. 3, lines 1-3, and Fig. 6, *compare to* '992 and '104 patents, Col. 3, lines 24-34, and Fig. 3).

67.     Despite having knowledge of this material '687 patent, and the Ziff reference cited therein, and all the material teachings of similar and identical bag features, Travel Caddy and its counsel withheld this material information from the Examiner during prosecution of the '992 and '104 cases.

68.     Travel Caddy and its counsel withheld the '687 patent from the attention of the Examiner, even though the '992 and the '104 patents were pending at the very **same** time, and have the **same** inventor (Mr. Redzsiz), the **same** owner (Travel Caddy), the **same** prosecuting attorney, the **same** features of binding, and fabric and rigid panels, and further despite the fact that '687 and the '992 and '104 teach the **same** or analogous art and technology of bags.

69.     The materiality of the Ziff reference, amongst others, was established again by the same Examiner (Kurt Fernstrom) in Travel Caddy's newest '261 continuation case (PX-10), when the Examiner rejected claims of equivalent subject matter and scope based thereon -- and most notably made particular and repeated reference to the Ziff teaching of a single continuous closed-loop binding. (*See*, Office Action of January 29, 2007, from '261 file history (PX-10/Tab 12).

As such, and regardless of whether Travel Caddy or its counsel subjectively believe these references to be material or not, the Court finds that the USPTO did find these references to be among the most material of all references, namely <u>invalidating</u> references. *Id.*

70.    Travel Caddy has argued that these references would not have been material to the '104 and '992 patent cases, because even though the Examiner had rejected claims in the '261 continuation application based on Ziff (amongst other material references), Travel Caddy was granted a very narrow sub-set of claims (i.e., claims 1-9) in the '261 continuation application. (PX-10).  Travel Caddy still further argues that the references would have been "merely cumulative" of the references already before the Examiner in the '992 and '104 patent cases. (*See*, Hearing Transcript, p. 147).   However, the prevailing law holds that a prior reference is not immaterial simply because claims are ultimately patented thereover. *Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer*, Inc., 326 F.3d 1226, 1237 (Fed. Cir. 2003) (The standard to be applied in determining whether a reference is "material" is not whether the particular examiner of the application at issue considered the reference to be important; rather, it is that of a "reasonable examiner."  Nor is a reference immaterial simply because the claims are eventually deemed by an examiner to be patentable thereover.).   Yet additionally, direct

evidence that the present material prior art references would **not** have been cumulative of the references already before the Examiner in the '992/'104 prosecution, is the fact that **the very same Examiner** in the '261 continuation application relied heavily upon these non-"cumulative" references in rejecting claims sharing the common subject matter of those allowed in the '992/'104 patents (i.e., all claims that <u>did not</u> contain the very narrow limitation drawn to the "bridging element").  As such, the Court does not find Travel Caddy's arguments persuasive.

71.    Yet additionally, and as a related matter, by virtue of Travel Caddy's counsel's choice to withhold the existence of the present litigation from the USPTO, the natural, probable and foreseeable consequences of this intentional choice was that Travel Caddy's counsel had further withheld from the USPTO (during prosecution of the '104 underlying patent application) all of the other material and invalidating prior art references that had been disclosed in Union Rich's LPR 4.3 Invalidity Contentions.  This particularly includes the Hoover reference (PX-2), which the Examiner had relied upon in combination with the Ziff reference (PX-1), to reject the commonly claimed subject matter in Travel Caddy's '261 continuation case. (*See*, Office Action of January 29, 2007, from '261 file history (PX-10/Tab 12).

72.     Travel Caddy, and its primary inventors Mr. Redzisz and Mr. Godshaw (the latter of whom is the president of Travel Caddy) are not tyros within the United States patent system.   There are (a) 80 pending patent applications naming Mr. Redzisz as an inventor (PX-49/Tab 22); (b) 60 published patent applications naming Mr. Redzisz as an inventor (PX-49/Tab 23); (c) 62 granted patents naming Mr. Godshaw as an inventor (PX-49/Tab 24); (d) 85 pending patent applications naming Mr. Godshaw as an inventor (PX-49/Tab 25); (e) 168 patents assigned to Travel Caddy (PX-49/Tab 26); and finally (f) a published patent application naming Mr. Godshaw and Mr. Nelson (counsel for Travel Caddy) as inventors.   Accordingly, the Record reflects that Travel Caddy and its primary inventors are avid, knowledgeable, and regular participants in the United States patent system and hence, have been advised on a multiplicity of occasions (through their counsel Mr. Nelson) of their duty to comply with their disclosure requirements before the USPTO. (*See*, PX-52/Tab 31 (excerpts from Deposition of Jon O. Nelson, pp. 112-114, 119-131).  Yet additionally, each time Travel Caddy's inventors execute a 37 CFR 1.63 oath/declaration in conjunction with any and all of the multiplicity of their patent filings, they are reminded of their uncompromising duties of disclosure under 37 CFR 1.56, as reference to same is explicitly set forth on the face of each such oath/declaration under 37 CFR 1.63 –

including those executed in conjunction with the '992 and '104 patents. (PX-8/Tab 29, and PX-9/Tab 30, respectively).

73.     Yet additionally, the facts and circumstances establish that Travel Caddy had express knowledge of the '687 patent/application (at least during prosecution of the '992 underlying patent application), because the '687 patent/application concerned bag technology that Travel Caddy was creating, developing and finalizing at the very same time Travel Caddy was creating, developing and finalizing the bag technology in the '992 underlying patent application. Accordingly, the Court finds that Travel Caddy and its counsel knew, and at the very least should have known, of the materiality of the '687 patent application, and at least the Ziff reference cited therein, but chose to withhold that material information from the USPTO's consideration during the prosecution of the patents-in-suit.

74.     Travel Caddy seeks to excuse its failure to call the material *Ziff* reference to the attention of the USPTO, and supposedly because Mr. Nelson had not read the Ziff reference when it was first cited in the '687 patent. (*See*, Hearing Transcript, p. 266 *et seq*.).  However, there was no testimony from the inventor of the '687 and '992/'104 patents, Mr. Redzisz, that Mr. Redzisz had not read the *Ziff* patent.  Where evidence is available on a material issue and is withheld, the trier of

the fact may properly draw the inference that the withheld evidence, if presented, would have been unfavorable to the withholding party. *Callahan v. Schultz*, 783 F.2d 1543, 1545 (11th Cir. 1986) ("The 'adverse inference' rule provides that 'when a party has relevant evidence within his control which he fails to produce, that failure gives rise to an inference that the evidence is unfavorable to him.'"); *International Union, United Auto., etc. v. NLRB*, 148 U.S. App. D.C. 305 (D.C. Cir. 1972) ("The adverse inference rule provides that when a party has relevant evidence within his control which he fails to produce, that failure gives rise to an inference that the evidence is unfavorable to him.").

### (c)    Count 3 -- Travel Caddy's False Claim of Small Entity Status, and Payment of Small Entity Fees.

75.    The USPTO allows "small entities" -- defined in 37 C.F.R. § 1.27 *et seq.* as independent inventors, small business concerns, and nonprofit organizations -- to pay patent fees reduced from those payable by a "large entity." Any party making an assertion of small entity status must make a declaration claiming small entity status.  *See* 37 C.F.R. § 1.27(c); MPEP § 509.03; MPEP § 2250.

76.    The definition of "small business concern" under 37 C.F.R. § 1.27(a)(2) is defined as any business concern that:

(i) Has not assigned, granted, conveyed, or licensed, and is under

no obligation under contract or law to assign, grant, convey, or license, any rights in the invention to any person, concern, or organization which would not qualify for small entity status as a person, small business concern, or nonprofit organization; and

(ii) Meets the size standards set forth in 13 CFR 121.801 through 121.805 to be eligible for reduced patent fees.

37 C.F.R. § 1.27(a)(2).

77.    Under 13 C.F.R. § 121.802, a concern eligible for reduced patent fees is one:

(a)  Whose number of employees, including affiliates, does not exceed 500 persons; and

(b)  Which has not assigned, granted, conveyed, or licensed (and is under no obligation to do so) any rights in the invention to any person who made it and could not be classified as an independent inventor, or to any concern which would not qualify as a non-profit organization or a small business concern under this section.

13 C.F.R. § 121.802.

78.    Congress has made the decision that the Public Policy in advancing the Useful Arts and Sciences is assisted by providing a reduced fee schedule to "small entity" patent applicants based upon the truth and reality that many of the best inventions come from brilliant individuals or very small companies, rather than large companies.  Without the subsidization of these small entity inventors through the payment of reduced fees, based upon the small entity status claim, many of the best inventions would be lost.

79.     In that regard, public policy is undermined, and the Constitutional purposes of advancing the Useful Arts and Sciences is damaged by those persons or entities who by those persons or entities who believe that they can make the unilateral choice of when to pay, what to pay and how much.

80.     Accordingly, where there has been an intentional failure to pay large entity fees, where required, the courts have found inequitable conduct. *See*, *Nilssen v. Osram Sylvania, Inc.*, 440 F. Supp. 2d 884, *aff'd* 504 F.3d 1223 (Fed. Cir. 2007); *Daimler-Chrysler AG v. Feuling Advanced Techs., Inc.*, 276 F. Supp. 2d 1054 (D. Cal. 2003).

81.     Yet additionally, the lack of motive for failure to pay large entity fees is irrelevant to the subject of inequitable conduct.  As the Court stated in the case of *Daimler-Chrysler AG v. Feuling Advanced Techs., Inc.*, 276 F. Supp. 2d 1054, 1062 (D. Cal. 2003):

> "The Court finds by clear and convincing evidence that James Feuling and his attorneys, John Duncan and Frank Gilliam, intentionally filed false claims to small entity status with the PTO, thus committing inequitable conduct. Why Feuling and his agents would put the enforceability of patents licensed for millions of dollars at risk to save a few thousand dollars in PTO fees is beyond reason. Yet, the evidence overwhelmingly supports the inference that they did so, and common experience confirms that the world has no shortage of individuals who commit irrational and self-destructive acts." *Id.; see also*, *Nilssen v. Osram Sylvania, Inc.*, 440 F. Supp. 2d 884, *aff'd* 504 F.3d 1223 (Fed. Cir. 2007).

82.     Still further, and in the case of *Nilssen v. Osram Sylvania, Inc.*, 440 F.

Supp. 2d 884, *aff'd* 504 F.3d 1223 (Fed. Cir. 2007), the court stated:

> "Nilssen acted with intent to mislead in declaring small entity status
> and in making small entity payments. Nilssen made multiple false
> declarations and small entity payments over several years. Nilssen's
> testimony as to why he believed he was entitled to small entity
> declarations and payments was not credible. Nilssen, a self-
> proclaimed expert in patent prosecution, had years of experience
> prosecuting and maintaining his patents. Nilssen regularly completed
> the required forms affirmatively declaring his status as a small entity.
> These forms, entitled "Verified Statement (Declaration) Claiming
> Small Entity Status," were signed by Nilssen under oath. The
> "Verified Statement" put Nilssen on notice of the specific C.F.R.
> provisions governing small entity status." *Id*. at 904.

83.     During prosecution of the '992 and '104 underlying patent

applications, Travel Caddy claimed small entity status, and took benefit of the

small entity fee payment schedule. (*See*, multiple transmittal forms to USPTO in

file histories of '992 and '104 patents (PX-8, 9/Tabs 33, 34)).  Travel Caddy's

counsel is fully aware of the legal requirements concerning small and large entity

status claims, as is Travel Caddy, *per se*. (*See*, PX-52/Tab 35 (excerpts from

Deposition of Jon O. Nelson, pp. 203-205)).  In that regard, Travel Caddy's

counsel testified that it is his practice to conduct an investigation of his clients, on

the specific issues of entity status, and thus inquiry into the client's size, number of

employees, business relationships, and whether the invention for which a patent is

sought is subject to any grant, conveyance or license. (*Id*.).  In that further regard, Travel Caddy's counsel also testified that he has no reason to believe that he did not follow this practice during prosecution of Travel Caddy's '992 and '104 underlying patent applications. (*Id*.).

84.    At the very same time the '992 and '104 underlying patent applications were pending, Travel Caddy, in a written agreement, did grant, convey or otherwise license at least one of the divisible patent rights to '992 and '104 patents to a non-small entity, Rooster Products, as discussed in detail, *infra*. (*See*, "An Agreement between Rooster Products International, Inc. and Travel Caddy Inc. dba as Travelon" (PX-25/Tab 36); *and see* PX-53/Tab 37 (excerpts from Deposition of Juan Pablo Cabrera, p. 117)).

85.    Rooster has had over 500 employees at all times relevant hereto, and thus is deemed to be a "large entity". (*See*, PX-53/Tab 39 (excerpts from Deposition of Juan Pablo Cabrera, pp. 37, 47)).   Accordingly, the statute thus prohibits Travel Caddy from claiming small entity status and paying small entity fees while engaged in this patent licensing arrangement with the large entity, Rooster.  Thus, Travel Caddy had been disqualified, under the patent laws, from claiming such "small entity status" during prosecution of the '992 and '104 patents and/or thereafter.

86.     More specifically, and contrary to Travel Caddy's contentions, the Court finds that under the Written Agreement (PX-25/Tab 36), Travel Caddy was not a mere purchaser and subsequent reseller of goods to which patent rights did not attach or extend – i.e., under the "first sale exhaustion doctrine".  Instead, Rooster (unlike anyone else in the Public) enjoyed a relationship with Travel Caddy that involved (i) the <u>exclusive</u> right to sell bags manufactured by Travel Caddy's agents, with each bag bearing a Rooster or Rooster affiliated logo (together with appropriate patent marking), and (ii) the divisible patent right to have the bags made for Rooster <u>by someone other than Travel Caddy's agent</u> in exchange for an identified royalty amount to be paid to Travel Caddy (i.e., a "sub-license" to "have made").  (*See, e.g.*, Written Agreement, ¶¶ 4, 9 (PX-25/Tab 36); *and see*, PX-53/Tab 37 (excerpts from Deposition of Juan Pablo Cabrera, p. 117); *and*, PX-50/Tab 38 (patent marking label)).  The Court finds that both of these activities, and particularly the latter, constitute patent licensing activity.

87.     The Court further finds that no evidence of "Travel Caddy" branded tool bags under the '992 and '104 patents-in-suit which any member of the Public may purchase from some general hardware store, and then subsequently resell to in the public retail sector.  Rooster alone had this right.  Thus, Travel Caddy's argument of "first sale exhaustion doctrine" is not cogent.

88.    Finally, Travel Caddy has argued that the Court has already decided that Rooster was not an <u>exclusive licensee,</u> so as to require Rooster's joinder as a party to this litigation. (*See*, Hearing Transcript, p. 149).  While nominally correct, Travel Caddy's argument is irrelevant to the issue before the Court -- that of whether Travel Caddy has committed small entity fee fraud, as suggested by Union Rich.  That is because the relevant issue now before the Court, on the subject of small entity fee fraud, is not whether Rooster is **<u>an exclusive licensee</u>**, but rather whether Rooster is **<u>a licensee</u>**, in any capacity of any of the divisible patent rights in and to the '992 and '104 patents.  In view of the Court's prior findings, *supra*, Travel Caddy's arguments are rejected.

### (d)    Counts 4-6 -- Travel Caddy's Fraudulent Claims of Inventorship, Fraudulent Claims of Application Priority, and Fraudulent Execution of Declaration

89.    For the reasons detailed *infra*, the Court finds that the Record establishes that Travel Caddy, and its inventor Mr. Redzisz, did not invent the tool bag embodiment depicted in Figs. 10-11 of the '992 and '104 patents-in-suit, and allegedly claimed in the '104 patent.

90.    Specifically, there is no disclosure -- written, pictorial, or otherwise -- of this Fig. 10-11 bag embodiment in Travel Caddy's <u>provisional application</u> filing

of March 20, 2002 (and from which the '992 and '104 patents claim priority). (PX-7/Tab 43).

91.   Instead, this Fig. 10-11 bag embodiment made its first appearance in the original filing of Travel Caddy's '992 underlying patent application, made on March 20, 2003.  (PX-8/Tab 44).

92.   In executing his Declaration in the '992 underlying patent application (the same Declaration of which was filed in the '104 underlying patent application), Mr. Redzisz stated that he was the "original, first and sole inventor of the subject matter" claimed, and that he acknowledged his duties under 37 CFR Section 1.56(a). (PX-8/Tab 45; PX-9/Tab 46).

93.   However, the Court finds that neither Travel Caddy nor Mr. Redzisz conceived and/or reduced to practice the bag embodiment shown in Figs. 10 and 11, and allegedly claimed in the '104 patent.  The sequential or chronological facts supporting this finding are set forth, *infra*.

94.   First, the Court draws particular attention to what is actually taught in the '992 and '104 patents with specific regard to the bridging elements 230 and 234, of Figs. 10 and 11.  In that regard, Travel Caddy teaches the Public in **only two (2) sentences** (which are parallel-worded), as follows:

> There is also included bridging elements, and more particularly a
> first bridging element 230 which fits over the truncated or generally

> triangular end portion 232 of the first end panel 222. A second
> bridging element 234 is provided to fit over the truncated or
> generally triangular shaped end 236 of the second end panel 224.

('992 patent, Col. 6, lines 23-29, and Fig. 11 (PX-8/Tab 47); ('104 patent, Col. 6, lines 23-29, and Fig. 11 (PX-9/Tab 48)).   Indeed, and this further regard, Mr. Nelson admitted that there are only two places in the '992/'104 written descriptions that refer to theses bridging elements: (1) Fig. 11, showing the bridging elements at the very top of the two end panels, and (2) Column 6, containing only two sentences, as set forth above. (*See*, Hearing Transcript, p. 312).

95.   With the foregoing two-sentence teaching in mind, and as is further evidenced with reference to the bridging elements 230 and 234 illustrated in Fig. 11 of the patents-in-suit, it is unambiguous that these bridging elements "fit over" **only a part of** each respective end panels.   Specifically, and as the patent specifications and Fig. 11 confirm, bridging elements 230/234 **fit only over the top end portion** of each end panel -- *i.e.*, "the truncated or generally triangular end portion 232" of the end panel 222, and "the truncated or generally triangular shaped end 236" of the end panel 222. (*Id.*).

96.   Second, and in contrast to the foregoing teaching, the Court draws specific reference to the bag structure set forth in Claims 5, 12, 23 and 30 of the

'104 patent.  Specifically, each of Claims 5, 12, 23 and 30 of the '104 patent are directed to the element of: "rigid reinforcing bridging elements fitted over **at least a part of** the first end panel and the second end panel." ('104 patent, Cols. 7-10 (PX-9/Tab 48)).  Manifestly, such broad claim language reciting "at least a part of" inherently contemplates "the entirety" or "up to and including the whole" – *i.e.*, a reinforcing bridging element that may be fitted over and around **the entire** end panel".  However, and after a careful review of the written description(s) of the '992 and '104 patents, the Court finds no such support for a reinforcing bridging element that may be fitted over and around **the entire** end panel -- but rather bridging elements that "fit over" **only a part of** each respective end panels, as is unambiguously taught in Fig. 11, and the corresponding two-sentences in Column 6, lines 23-29, of each of the '992 and '104 patents, as discussed *supra*.

97.    Third, the first and only disclosure of such a reinforcing bridging element that may be "fitted over **at least a part of**" -- and thus around **the entire** -- end panel, was not made until Claims 5, 12, 23 and 30 were sequentially injected into the '104 patent application.  Specifically, the claim language "rigid reinforcing bridging elements fitted over at least a part of the first end panel and the second end panel" was added for the first time (by Travel Caddy's counsel) as Claim 5 in the <u>original filing</u> of the '104 underlying patent application, made on November 4,

2004. (PX-9/Tab 51). Thereafter, Claim 12, comprising identical language, was added on January 4, 2005, by way of a Preliminary Amendment filing. (PX-9/Tab 52). Lastly, Claims 23 and 30, also of identical language, were added on October 24, 2005, by way of yet an additional amendment to the claims, in response to an Office Action mailed on January 25, 2005. (PX-9/Tabs 53, 54).

98. Fourthly, and bearing the foregoing collective facts in mind, the Court now turns to the facts surrounding the Plumber's Tote Bag actually sold by Travel Caddy. Specifically, Travel Caddy's Plumber's Tote Bag -- the bag embodiment allegedly of Figs. 10-11, and claimed in the '104 patent -- was first publicly disclosed at least as early as November 2002. (*See*, DX-38/Tab 50 ("Craftsman" labeled Plumber's Tote Bag bearing a Travelon tag with the wording "SAMPLE", and which tag further assigns a date of November 23, 2002, to the sample).

99. Yet additionally, Travel Caddy's Plumber's Tote Bag was actually first sold in "September or October of 2003". (*See*, Travel Caddy's Memorandum of Law in Support of its Motion for a Preliminary Injunction, at p. 5, *and* Exhibit C thereto, constituting the Declaration of Donald Godshaw, at ¶ 12 (PX-51/Tab 49)). Most notably, this 2002/2003 Travel Caddy Plumber's Tote Bag indisputably included reinforcing bridging elements (or "flanges") fitted over and around **the entire** perimeter of the end panels. (DX-38, 39/Tab 50).

100.   Comparing now the relevant dates set forth *supra*, the broad claim language of Claims 5, 12, 23 and 30 of the '104 patent -- *i.e.*, flanges or bridging elements fitted around **the entire** perimeter of the end panels -- was sequentially added **on or after November 4, 2004**, and specifically through the '104 prosecution history, by Travel Caddy's attorneys, and, thus, **well after** Travel Caddy's date of first public disclosure (November 2002) and first sale (September/October 2003) of the Plumber's Tote Bag.   Specifically, the bag embodiment of Claims 5, 12, 23 and 30 was first disclosed **more than one year** from either of Travel Caddy's date of first public disclosure (November 2002) or first sale (September/October 2003).   Accordingly, and under such facts, Travel Caddy was statutorily barred from attempting to lay claim to the bag embodiment of Claims 5, 12, 23 and 30.  *See*, 35 U.S.C. 102(b).

101.   Fifthly, the Court further notes that there are <u>no claims</u> drawn to these bridging elements -- of whatever scope -- in the '992 patent and its file history (*see*, PX-8, generally), despite Travel Caddy having every opportunity to claim such a structure in the '992 underlying patent application.

102.   Accordingly, and based on the chronology of facts, and the dates of injection of Claims 5, 12, 23 and 30 into the '104 patent file history, the Court finds that at some point subsequent to the original filing of the '992 application

(which included Figs. 10-11 and the associated Column 6 text), Travel Caddy and its lawyers determined that what was actually shown in Figs. 10-11 was **not** what Travel Caddy had first publicly disclosed in at least November 2002, or what Travel Caddy was actually selling and offering for sale in September/October 2003.

103.   However, and in an effort to fraudulently conceal the evidence of this statutory public disclosure bar and statutory on-sale bar, Travel Caddy, by and through its attorneys, did add the "corrective" Claims 5, 12, 23 and 30 during prosecution of the '104 underlying patent application, which claims would now read-on a rigid reinforcing bridging element, or flange structure, that would **extend around the entire** end panels (*ala*' the claim language "at least a part of"), and thus cover the bag that Travel Caddy has placed on sale more than 1-year prior to any effective filing date for Claims 5, 12, 23, and 30.  Accordingly, Travel Caddy's reason for such "corrective" or "covering" late-added, unlawful, and unsupported claims was to conceal the statutory public disclosure and on-sale bars of November 2002 and September/October 2003, respectively. (*See*, 35 U.S.C. 102(b), (f), and 112).

104.   To that extent, and other than the attempted "corrective" Claims 5, 12, 23 and 30 of the '104 patent, the Court finds that Travel Caddy has failed to

explain away the utter absence of any teaching or disclosure, anywhere in the patent file histories, of this preferred (**and manufactured and sold**) Plumber's Tote Bag, which comprises a flange or bridging element fitted over and around the entire perimeter of the end panels. (DX-38, 39/Tab 50; *and see* 35 U.S.C. 112). Instead, Travel Caddy has sought refuge in the contra-teachings of Fig. 11, and the corresponding two-sentences in Column 6, lines 23-29, of each of the '992 and '104 patents.

105.  Stated differently, the Court must ask the following rhetorical question: Why didn't Travel Caddy specifically teach and describe -- in either of the '992 and '104 patent written descriptions and Figures -- reinforcing bridging elements fitted over and around **the entire** perimeter of the end panels, instead of limiting themselves to the specific written and illustrated disclosure supporting only a bridging element fitted over only the top portion of the end panels (a bag structure neither manufactured nor sold by Travel Caddy)?

106.  Still further, the Court does note that, throughout this litigation, Travel Caddy has consistently had problems explaining away its oddly short and nondescript treatment of this Fig. 10 and 11 bag embodiment -- along with the mere scant half-column of associated written disclosure, which (tellingly) incorporates by reference all disclosure concerning the very different and separate

Electrician's Bag structure of Figs 1-9 and Columns 1-5 of the written description of the patents-in-suit.  To that extent, the Record does establish that Mr. Redzisz was not a "rookie" inventor, but in fact is listed as an inventor in nearly 100 patent filings.  Accordingly, the further inference is created that, if Mr. Redzisz had in fact invented the bag embodiment of Figs. 10-11, he would have presented some sufficiently enabling disclosure that might otherwise describe in detail (a) the bag embodiment of Figs. 10 and 11, and specifically (b) these reinforcing bridging elements that are apparently a structure unique to the bag embodiment of Figs. 10 and 11 alone.  Instead, and regarding this bridging element, Travel Caddy provides only two sentences of description, and which sentences fail to explain, in any capacity, what the function or purpose of such bridging elements might be, and why Travel Caddy has chosen to include these bridging elements in the Fig. 10 and 11 bag embodiment.

107.  Because Travel Caddy has failed to explain away these multiple inconsistencies, the Court does find that the named inventor did not invent the bag embodiment of Figs. 10-11.  Stated differently, the sequence of "corrective" claim language additions by Travel Caddy's attorneys in the '104 patent application, and the lack of descriptive and pictorial information regarding the bag embodiment of

Figs. 10-11, further evidence that Mr. Redzisz was not the inventor of that bag embodiment. (*See*, 35 U.S.C. 102(f), 112).

108.   Still further, and notwithstanding Mr. Redzisz' Declaration that he understood his "duty under Section 1.56(a) to disclose information material to patentability," the Court further finds that Mr. Redzisz and his counsel willfully failed to disclose to the USPTO that the later-injected claims of 5, 12, 23, and 30 in the '104 patent application claimed a structure that had been on-sale for more than 1-year prior to being claimed in the '104 patent -- a disclosure that, had it been timely made, would have rendered Claims 5, 12, 23, and 30 of the '104 patent application unpatentable as a matter of law. (*See*, 35 U.S.C. 102(b)).

109.   Yet additionally, when Travel Caddy represented to the USPTO that the '104 application was a <u>continuation application</u> of the '992 patent (PX-9), that was a material misrepresentation made to USPTO.  Specifically, the "corrective" Claims 5, 12, 23, and 30 of '104 application added additional subject matter that had never been disclosed or taught in either the underlying provisional application or the '992 underlying patent application from which the '104 patent claims priority as a continuation application. *See*, *Nilssen v. Osram Sylvania, Inc.*, 440 F. Supp. 2d 884, *aff'd* 504 F.3d 1223 (Fed. Cir.2007).

110.   Instead, the '104 underlying patent application was in fact a "continuation-in-part" application because of this newly added subject matter. (*Id.*).   The Court finds that Travel Caddy's misrepresentation of the "continuation-in-part" status of its '104 patent application to the USPTO, initially done to conceal the statutory public disclosure and on-sale bars, had the further effect of unlawfully avoiding the swathe of intervening prior art. (*Id.* at 894 ["Nilssen's improper claim of priority to the effective date of March 20, 1978 was material to applications issuing as the *'409*, *'160*, *'386*, and *'043 Patents* <u>because it allowed Nilssen to potentially avoid prior art and obtain patent claims to which he would not otherwise be entitled.</u>"] (Emphasis added)).   "False statements regarding a patent application priority date may constitute inequitable conduct. Because the effective filing date of each claim in a patent application determines which references are available as prior art for purposes of 35 U.S.C.S. §§ 102 and 103, information regarding the effective date is of the utmost importance to an examiner. Consequently, an applicant's misrepresentation that he is entitled to the benefit of an earlier filing date is highly material. Inequitable conduct has not been found by merely claiming priority to an earlier patent where the specifications, but not the claims, of the later patents are supported by the earlier patent." *Nilssen v. Osram Sylvania, Inc., 440 F. Supp. 2d 884, 906 (D. Ill. 2006).*

111.   The Court still yet further finds that Travel Caddy's intent to deceive is further established based upon the fact that Travel Caddy charged infringement of Claims 5, 12, 23 and 30 of the '104 patent against Union Rich's Pro-Tool Bag structure (PX-27), which Pro-Tool Bag does contain this flange or reinforcing bridging structure disposed around the entire perimeter of each of the end panels (*see*, disassembled Pro-Tool Bag of PX-29).   Indeed, it is this very same "circumferential-disposed" reinforcing structure that Travel Caddy attempted to cover under the overly broad and unsupported claim language of "at least a part of…" in Claims 5, 12, 23, and 30 of the '104 patent.   As stated *supra*, such claim language impermissibly covers subject matter that (a) is unsupported in the patent prosecution histories, and (b) was not timely disclosed prior to Travel Caddy's public use and on-sale activities in 2002 and 2003, respectively. (*See*, 35 U.S.C. 102(b), 102(f), 112).

112. Accordingly, the Court does find that the collective activities concerning Travel Caddy's and its counsel's "late claiming" and "first disclosure/sale" constitute a fraudulent claim of inventorship under 35 USC § 102(f), fraudulent declaration execution and thus fraudulent application priority, intended to cover-up Travel Caddy's self-created 2002 and 2003 public use or disclosure and on-sale bar activities.

## 2.  Unenforceability for "Patent Misuse"

113.   Union Rich has further contended that the '992 and '104 patents are unenforceable for patent misuse, and specifically has alleged that Travel Caddy has engaged in the post-issuance patent licensing conduct of exacting royalty payments for bag structures that are not covered by any of the claims of the '992 and '104 patents. (*See*, PX-26/Tab 40, "Patent Licensing Agreement", preamble, and ¶ 4 thereof, dated September 1, 2007 (constituting a royalty-bearing license of '992 and '104 patents to Great Star, for the Great Star product known as the "Task Force" Bag, Item No. 246673)).

114.   The defense of patent misuse arises from the equitable doctrine of unclean hands, and relates generally to the use of patent rights to obtain or to coerce an unfair commercial advantage.  The doctrine of patent misuse forbids a patentee from taking actions that affect competition in unpatented goods or that otherwise extend the economic effect beyond the physical scope of the patent grant (by charging a royalty on goods not covered under the patent) or the temporal scope of the patent grant (by charging a royalty beyond the patent's expiration date) with anticompetitive effect.  Hence, the key inquiry is whether, by imposing conditions that derive their force from the patent, the plaintiff has impermissibly broadened the scope of the patent grant with anticompetitive effect. *GFI, Inc. v.*

*Franklin Corp.*, 88 F. Supp. 2d 619 (D. Miss. 2000); *Bausch & Lomb v. Allergan, Inc.*, 136 F. Supp. 2d 166 (D.N.Y. 2001); *General Tire & Rubber Co. v. Firestone Tire & Rubber Co.*, 349 F. Supp. 333 (D. Ohio 1970); *and see*, *Netflix, Inc. v. Blockbuster, Inc.*, 2006 U.S. Dist. LEXIS 63154 (D. Cal. 2006); *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 140-41, 89 S.Ct. 1562, 23 L.Ed.2d 129, 161 U.S.P.Q. (BNA) 577 (1969). *Van Well Nursery, Inc. v. Mony Life Ins. Co.*, 2007 U.S. Dist. LEXIS 15694 (D. Wash. 2007).

115.   As the Court did observe during the February 4, 2008, Evidentiary Hearing, the Great Star bag licensed under the subject Patent License Agreement is a plumber's tote-style bag, and in which <u>all four (4)</u> lateral sides or panels are constructed of a fabric-covered <u>rigid</u> plastic sheet. (PX-32, 33/Tab 42).  Moreover, the bottom of the licensed Great Star bag is constructed of a fabric-covered flexible foam sheet, which can in no genuine sense be considered to constitute a "rigid" bottom structure, as required by the claims of the '992 and '104 patents.  As such, the Court finds that the licensed Great Star bag is not covered by any claims of the '992 or '104 patents, under the prior rulings of the Court, and as affirmed by the Federal Circuit.  Consequently, and given the recent September 1, 2007 date of the Great Star license, the Court further finds that Travel Caddy was fully advised of the Court's prior *Markman* rulings, but knowingly engaged in the very recent and

unclean patent licensing conduct of exacting royalty payments for bag structures that are not covered by any of the claims of the '992 and '104 patents.  Such activity constitutes a classic case of patent misuse.

C.     **Invalidity of '992 and '104 Patent Claims.**

1.     **Invalidity under 35 U.S.C. § 103 for Obviousness.**

116.   The obviousness or non-obviousness of patent claims has long been determined pursuant to the standards set forth in the case of *Graham v. John Deere Co.*, 383 U.S. 1, 17 (1966).

> "While the ultimate question of patent validity is one of law, *A & P. Tea Co. v. Supermarket Corp., supra at 155, the §103* condition, which is but one of three conditions, each of which must be satisfied, lends itself to several basic factual inquiries. Under *§103*, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy." 383 U.S. 17-18.

117.   With regard to the factor of "scope and content of the prior art", the Court finds that the prior art utilized by the Examiner in examining and rejecting claims of the '261 continuation application (PX-10/Tab 57), constitutes more

pertinent prior art than the prior art that the very same Examiner had utilized in examining the '992 and '104 patents.

118.   In that regard, in the Examiner's Notice of Allowance issued in the '992 underlying patent application, the Examiner had allowed each of Claims 1-4, and had commented as "reasons for allowance" that: "The prior art fails to disclose or suggest the device of claims 1 and 4.  In particular, there is no disclosure or suggestion of a case for carrying tools having rigid or semi-rigid end panels having the claimed features, and flexible fabric front and back panels joined to the end panels and a rigid bottom panel in the manner claimed." (Reasons for Allowance, dated August 25, 2004 (PX-8/Tab 55).

119.   However, in examining the claims of the '261 continuation application, the Examiner rejected the broad claims of the '261 continuation application (i.e., Claims 10, 11, 13, 14) over the combination of *Hoover* (PX-2/Tab 62) in view of *Christman* (PX-3/Tab 66) and further in view of *Ziff* (PX-1/Tab 63)*, Baum* (PX-4/Tab 65) and *Huang* (PX-5/Tab 67), and Claims 15, 16, 17, 19 and 20 and further in view of *Kornblatt* (PX-6/Tab 68).

120.   The Court finds that the references of *Hoover, Christman, Ziff,* and *Kornblatt* constitute closer prior art than any prior art available to the Examiner during the examination of the '992 and '104 patent applications.

121.   Yet additionally, and by virtue of withholding knowledge of the related litigation from the attention of the Examiner, Travel Caddy's counsel still further withheld from the Examiner (during examination of the '104 patent) the prior art comprising *Hoover, Christman, Ziff, Baum,* and *Kornblatt*.

122.   The Court finds that, had Travel Caddy complied with its duty of disclosing the present litigation to the United States and Patent Trademark Office, the references of *Hoover, Christman, Ziff, Baum,* and *Kornblatt* would have been available to the Examiner.   In that regard, and based upon the analysis of these prior art references, *infra*, the Court further finds that the claims of the '104 patent (with the exception of Claims 5, 12, 23 and 30) would likely not have issued.

123.   The Court further finds that had this highly pertinent prior art been made available to the Examiner during the examination of the '992 patent, none of the four claims of that patent (Claims 1-4) would likely have issued.   In that regard, the Court further finds that the "reasons for allowance" given by the Examiner (i.e., that the prior art available during the examination of the '992 patent did not disclose a combination of "rigid" and "flexible" panels) is not the case in view of the various combinations of *Hoover, Christman, Ziff, Baum, Huang* and *Kornblat.* Specifically, the *Hoover* reference (PX-2/Tab 62) expressly teaches and discloses a bag comprising a combination of "rigid" and "flexible" panels (*see, e.g., Hoover,*

Figs. 2, 3; Col. 3, lines 29-46; Col. 4, lines 8 *et seq.*; note stiffening members 20, 35).  As for the rigid bottom panel described in the claims of the '992 and '104 patents, *see, e.g., Christman*, Col. 2, lines 49-53; Fig. 2. (PX-3/Tab 66).   Yet additionally, and as to the single continuous, closed-loop binding, *see, e.g., Ziff*, Figs. 1-3; Col. 1, lines 65-70 (PX-1/63); *also see* the '687 patent, Fig. 1 (PX-11/Tab 64).  As stated *supra*, the foregoing analysis equally applies to the claims of the '104 patent, with the exception of Claims 5, 12, 23 and 30, for reasons detailed *infra*.

124.   The Court also finds that the Examiner's detailed Official Action (PX-10/Tab 57) rejecting the broad claims in the '261 continuation case (Claims 10-20) is highly pertinent to the invalidity (for obviousness over the art) of the claims of the '992 patent and the claims of the '104 patent (with the exception of Claims 5, 12, 23 and 30, as discussed below), inasmuch as the subject '992 and '104 patent claims recite the same or common subject matter set forth in the rejected '261 application claims (as is further confirmed by the Examiner's double patent rejections issued in both the '104 and '261 applications, as discussed *supra*).

125.   With regard to each of Claims 5, 12, 23 and 30 of the '104 patent, the Court finds that these particular claims would not be rendered invalid over the combination of prior art references comprising *Hoover, Christman, Ziff, Baum,*

*Huang and/or Kornblatt*, inasmuch as each of these claims contain the limitation of "rigid reinforcing bridging elements fitted over at least a part of the first end panel and the second end panels."  In that regard, the Examiner in the '261 continuation case had allowed Claims 1-9, and further indicated allowability of Claim 12, all of which claims include this limitation, and more specifically the limitation of "rigid reinforcing bridging elements extending over at least a part of the first end panel and the second end panel" in Claims 1-9, and the limitation of "rigid reinforcing bridging elements configured over at least a part of the first end panel and the second end panel" in Claim 12. (*See,* '261 file history, Office Action of January 29, 2007 *(*PX-10/Tab 57); *and see*, Response to Office Action, dated October 17, 2006 (PX-10/Tab 56)).

126.   Nonetheless, and despite this citation in the '261 application to the allowable limitation of "rigid reinforcing bridging elements extending [or configured] over at least a part of the first end panel and the second end panel", the Court finds that such a claim/limitation allowance does not save Claims 1-4 of the '992 patent from invalidity.  Specifically, and as detailed *supra*, the '992 patent **does not** contain any dependent claims having this limitation (i.e., drawn to any such bridging element), which (*albeit* non-existent) valid dependent claims Travel Caddy might otherwise have sought to re-write (without substantive change) into

independent form.  Thus, all of the claims of the '992 patent are invalid.  But, in any event, Travel Caddy would not be entitled to seek to rewrite dependent claims into independent form in either the '992 or '104 patent claims, inasmuch as the limitation of "rigid reinforcing bridging elements fitted over at least a part of the first end panel and the second end panels", reads on a bag embodiment that is invalid for (a) lack of a proper "written description" under 35 USC § 112, (b) prior public use and/or on-sale bars under 35 USC § 102(b), and (c) for wrong inventorship under 35 USC § 102(f), as discussed detail hereinabove.

127.  In light of the analysis set forth hereinabove, the Court yet further finds that, as to the second *Deere* factor, *supra*, there is no difference between the prior art and the subject '992 and '104 patent claims at issue, and specifically because the combination of teaching of the above cited prior art contains each and every limitation of the claims (excepting Claims 5, 12, 23 and 30 of the '104 patent, which are invalid for the reasons stated herein).

128.  The Court further finds that the Examiner in the '261 application was justified in combining the prior art references, as set forth in his Official Action (PX-10/Tab 57), and based upon the standards of the Supreme Court case *KSR International Co. v. Teleflex, Inc. et al.*, 127 S. Ct. 1727 (2007).  In that case, the Supreme Court stated "For over a half century, the Court has held that a 'patent for

a combination which only unites old elements with no change in their respective functions…obviously withdraws what is already known into the field of its monopoly and diminishes the resources available to skillful men.'", quoting from *Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp.,* 340 U.S. 147 (1950). The High Court further stated: "This is a principal reason for declining to allow patents for what is obvious. The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." *KSR* at 1740. Thereafter, the Supreme Court further discussed the cases of *United States v. Adams*, 383 U.S. 39 (1966); *Andersons-Black Rock, Inc. v. Pavement Salvage Co.*, 396 U.S. 57 (1966); and *Sakraida v. AG Pro, Inc.*, 425 U.S. 273 (1976). Whereupon, the Supreme Court held that the incentive or reason for combining the teachings of the prior art may be based upon any rational consideration, and need not come from the teaching of the references themselves. *KSR* at 1742. Yet additionally, the Supreme Court held that:

> "When there is a design need or a market pressure to solve a problem and there are a finite number of identifiable, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp. If this leads to anticipated success, it is likely the product not of innovation but of ordinary skill and common sense. In this instance the fact that a combination was obvious to try might show that it was obvious under §103."

*KSR* at 1743.

129.   The Court finds that the cautionary pronouncements of the Supreme Court in the *KSR* case are directly applicable to the facts here.  Specifically, there exists in this case a readily available reason for combining the teachings of the prior art, and in particular in the manner in which the Examiner has done so. Clearly, all of the cited prior art is derived from the same field of endeavor, and the person skilled in the art would thus have a clear motivation to combine such prior art, utilizing known techniques, and in order to produce a bag having known and expected features.

130.   On the *Deere* factor of "level of ordinary skill in the art", the Court expressly declines to make a ruling on the appropriate level of skill, based upon the principles set forth in the seminal case of *Chore-Time Equipment Inc. v. Cumberland Corp.*, 713 F.2d 774 (1983), and for the reasons set forth by the Federal Circuit therein that "because the subject matter of the patent and the prior art were in this case so easily understandable, a factual determination of the level of skill in the art was unnecessary…", citing *Schutt Manufacturing Co., v. Riddell*, 673 F.2d 2002, 2005 (7th Cir. 1982); *Monaplastics, Inc. v. Caldor, Inc.,* 378 F.2d 20, 21 (2nd Cir. 1967); *Chore-Time Equipment Inc.,* 713 F.2d at 779.   In that regard, the Federal Circuit further stated (at fn. 2) that, "We hold only that an invention may be held to have been either obvious (or non-obvious) without a

specific finding of a particular level of skill or the reception of expert testimony on the level of skill where, as here, the prior art itself reflects an appropriate level and a need for such expert testimony has not been shown." *Id.*

131. Accordingly, Union Rich has established a *prima facie* case of obviousness for the claims 1-4 of the '992 patent and Claims 1-4, 6-11, 13-22, 24-29, and 31-32 of the '104 patent.

132. To the extent that Travel Caddy has sought to overcome Union Rich's *prima facie* case through introduction of evidence of certain "secondary considerations" pursuant to the case of *Graham v. Deere*, such purported evidence of "secondary considerations" is inadequate, and does not overcome Union Rich's showing of *prima facie* obviousness.

133. The Court yet further finds that there is little, if any, probative value in regard to Travel Caddy's attempted "secondary considerations". (*See*, Hearing Transcript, testimony of Cathy Curtain, p. 157 *et seq*.)  As the Federal Circuit stated in the case of *In Re Ben Huang,* 100 F.3d 135 (1996): "Even assuming that Huang had sufficiently demonstrated commercial success, that success is relevant in the obviousness context only if there is proof that the sales were a direct result of the unique characteristics of the claimed invention – as opposed to other

economic and commercial factors unrelated to the quality of the patented subject matter." *Id*. at 140 (emphasis added).

134.   In the present circumstance, it does not appear that any of the sales made by Union Rich of the Electrician's Bag II and/or Union Rich's Pro-Tool Bag can qualify as "commercial success" of Travel Caddy's patent claims, because the Court has ruled that Union Rich's Electrician's II Bag and Pro-Tool Bag are not covered by the claims of either of Travel Caddy's '992 and/or '104 patents.

135.   As for Travel Caddy's purported sales of its own version of the Pro-Tool Bag (i.e., referred to as the "Plumber's Tote Bag"), it would likewise appear that Travel Caddy's Plumber's Tote Bag is **not** covered by the claims of Travel Caddy's patents, as it also apparently contains the very same "non-infringing" features and elements as the Union Rich Pro-Tool Bag.

136.   As for Travel Caddy's sales of its Electrician's Tool Bag, it would appear that <u>all of Travel Caddy's sales</u> of its bags have been made to its exclusive distributor (Rooster), and as such have been combined together with sales of many other bags and products.   Accordingly, it would appear that is this prior close relationship between the two companies has driven the sales of the Electrician's Bags and Plumber's Tote Bags from Travel Caddy to Rooster, and not any of the purportedly patented features of the bag.

137.   Finally, in this regard, and assuming *arguendo* that Rooster's subsequent re-sales of the bags could be deemed relevant (which appears to be unlikely), the Court cannot deem such re-sales of Rooster's Electrician's Bag as constituting a proper "secondary consideration" under the *Deere* case, inasmuch as there is nothing in the Record indicating that Travel Caddy's Electrician's Bag is a superior product, or that any of such re-sales of this bag have come about as a result of superior features of the bag.   Indeed, Travel Caddy/Rooster have complained throughout this case that in head-to-head competition with Union Rich's bags, the retailer customers (such as Home Depot, Johnson Level & Tool, other companies) and their customers have preferred Union Rich's bags to the bags that Rooster has sought to re-sell. (*See*, Hearing Transcript, p. 163-164).  One such further reason may be that Union Rich's Electrician's Bag is not covered by the claims of the '992 and/or '104 patents, because it is constructed of five (5) rigid panels, rather than from a combination of rigid and flexible panels, which provides a less stable, less secure, and less puncture-proof bag.

138.   Travel Caddy may also attempt to argue the presence of the secondary consideration of "license"; but, Travel Caddy's license with Rooster comprises a bulk license of a huge number of separate patents. (PX-25).  Hence, no reasonable argument could be made that Rooster was willing to take this bulk license just to

get rights under the '992 and '104 patents.  In fact, the '992 and '104 patents are not even mentioned in the license, and in particular because they were added later.

139. Yet additionally, belatedly, and as late as September 2007, Travel Caddy has alleged another putative licensee, *i.e.*, Great Star Tools. (PX-26). However, and as the Court observed, the Great Star bag under that license is not covered by any of the claims of the '992 and '104 patents-in-suit.  Specifically, the Great Star bag has four rigid side panels, no flexible side panels, and a bottom panel that is <u>not</u> rigid.  Accordingly, Travel Caddy has produced no credible evidence of the presence of the "secondary consideration" of licensing.

140. Yet additionally, another competitor in the marketplace has recently filed suit against Travel Caddy for a Declaratory Judgment of invalidly and non-infringement (*See,* Consolidated Pre-Trial Order). *Olympia Tools International, Inc. v. Travel Caddy, Inc., d/b/a Travelon,* USDC C.D.CA Civil Action No. CV08-00121-GHK (SSx).  The presence of yet another challenge to the validity and non-infringement of the '992 and '104 patents shows a lack of any substantial tribute by the trade to Travel Caddy's '992 and/or '104 patents that would qualify as a "secondary consideration". (*See*, *Graham v. Deere*, *supra*).

141. In summary, the Court does not find the presence of sufficient "secondary considerations" to overcome the *prima facie* case of obviousness made

out by Union Rich, and accordingly finds that each of Claims 1-4 of the '992 patent and Claims 1-4, 6-11, 13-22 and 24-32 of the '104 patent is invalid for obviousness under 35 U.S.C. § 103.

142.   Travel Caddy attempts to excuse the clear invalidity of at least the '992 patent claims by reliance on the bare statement of Union Rich's former counsel, Ms. Mandy Wilson-Decker that, at the time she made her statement in 2005 (*see*, DX-135), she personally did not then have adequate evidence of invalidity.   However, very little weight can be given to Ms. Wilson-Decker's preliminary opinion, which opinion (a) had been based on only limited searching, (b) was not motivated by the existence of actual litigation, and moreover (c) could not have possibly taken into account the standards of the current law in assessing obviousness under the recent U.S. Supreme Court case of *KSR*.

### 2.    Invalidity of Claims 5, 12, 23 and 30 of the '104 Patent under 35 USC §§ 112, 102(b)

143. Although Claims 5, 12, 23 and 30 of the '104 patent are not found herein to be invalid over the prior art, each of these claims is found by the Court to be invalid under the provisions of 35 U.S.C. § 112 and/or 35 U.S.C. § 102(b), or 35 U.S.C. § 102(f).

144.   In particular, each of claims 5, 12, 23 and 30 includes the limitation "rigid reinforcing bridging elements fitted over at least a part of the first end panel

and the second end panel."  However, there is no support in the Specification for the phrase "at least a part of…".  Indeed, the only references to the purported rigid reinforcing bridging elements are found in the highly schematic depiction of Fig. 11, and in the following two brief sentences from the Specification: "There is also included bridging elements, and more particularly a first bridging element 230 which fits over the truncated or generally triangular end portion 232 of the first end panel 222.  A second bridging element 234 is provided to fit over the truncated or generally triangular shape in panel 236 of the second end panel 224." (*See* '104 patent Col. 6 lines 23-29 (PX-9)).  Examination of the rigid reinforcing bridging elements in Fig. 11 shows that such bridging elements <u>do not</u> extend entirely around the periphery of the end panels 222, 224.  Instead, the bridging elements only cover the "the truncated or generally triangular end portion 232, 236" of the respective end panels.  However, the phrase "over <u>at least a part of</u> the first end panel and the second end panel" is broad enough to cover a structure which extends all the way around the periphery of end panels 220 and 224 – *i.e.*, circumferentially.  Yet, there is no disclosure in Travel Caddy's Specification of any such <u>entirely circumferential</u> bridging element structures.  There must be support in the Specification for each and every element of a patent claim, and

failing compliance with this requirement, such a claim is invalid. *See,* 35 U.S.C. § 112.

145.   In addition, the Record shows that Travel Caddy had sold to the public Plumber's Tote Bags that included a feature covered by the broad language "at least a part of …" as used in Claims 5, 12, 23 and 30, and did so more than a year prior to the date this broad language was first injected into the case.  In that regard, the first of these Claims, Claim 5, was added to the series of applications as of the filing date of November 4, 2004.  However, Travel Caddy has represented that it had sold to members of the public the Travel Caddy Plumber's Tote Bag as early as September or October of 2003 (*See* ,Travel Caddy's Memorandum in Support of Preliminary Injunction Motion, Declaration of Godshaw, para. 12), and had thus done so more than a year prior to the filing date of the '104 patent.

146. The Patent Act specifically requires that a "written description" be provided for the invention. *See* 35 U.S.C. § 112.  In that regard, the Supreme Court has stated "Section 112 requires that the application describe, enable, and set forth the best mode of carrying out the invention." *Festo Corp. v. Shoketsu Kincoku Kogyo Kabushiki Co.,* 535 U.S. 722, 724 (2002).   This statutory "written description" requirement has been applied to cases involving a wide variety of technology. *In Re Curtis* , 354 F.3d 1347 (Fed. Cir. 2004) (dental floss); *Tronzo v.*

*Biomet, Inc.*, 156 F.3d 1154 (Fed. Cir. 1998) (artificial hip sockets); *Gentry Gallery, Inc. v. Berkline Corp.* 134 F.3d 1473 (Fed. Cir. 1998) (sectional sofas); *Lockwood v. American Airlines, Inc.*, 107 F.3d 1565 (Fed Cir. 1997) (automated sales terminals); *Vas-Cath, Inc. v. Mahurkar*, 935 F.2d 1555 (Fed. Cir. 1991) (double lumen catheters).  The purpose of the written description requirement of 35 U.S.C. § 112 is to prevent applicant's from adding to the application purported new inventions to an older disclosure. *See, Regents of The University of California v. Eli Lily & Co.*, 119 F.3d 1559 (Fed. Cir. 1997).

147.  In sum and substance, Travel Caddy has sought to claim a bridging element that extends entirely around the periphery of the end panels, but however, this structure is not disclosed in the application, as filed, by Travel Caddy. Accordingly, this feature is not a legitimate part of any purported invention made by Travel Caddy's inventor, Mr. Redzisz.  In fact, the language, "at least a part of…" is language that was added by Travel Caddy's lawyers in the prosecution of the '104 underlying patent application.  Hence, each of Claims 5, 12, 23 and 30 of the '104 patent is invalid under § 112, and also under § 102(b) and 102(f).

148.  Where there has been a prior public use or "on sale" of the invention (pursuant to 35 U.S.C. § 102(b)) for more than one year prior to the "effective filing date" of the subject matter of the claim, the claim is invalid. *Id.*

149.  In the present circumstance, the effective filing date of the claim limitation "at least a part of…" is the filing date of the '104 application – *i.e.*, November 4, 2004.  That is because there is no support for this limitation in the original Specification of the underlying patent application that later issued as the '992 patent.  Accordingly each of Claims 5, 12, 23 and 30 is further invalid for violating the "on-sale bar" provisions of 35 U.S.C. § 102(b).

150.  The Court notes that the purported expert testimony of one Mr. Korchmar was offered.  However, the Court does not require expert testimony in order to understand the underlying subject matter of the '992 and '104 patents, which involves relatively simple technology that is readily understood by the layperson.  Moreover, the Court finds that the testimony sought to be presented by Mr. Korchmar, as an alleged expert, did not have sufficient nexus with any of the issues of inequitable conduct or patent validity/invalidity that are before the Court for adjudication.  Accordingly, the Court did not deem it necessary or beneficial for Mr. Korchmar to testify.

151.  Any finding of fact set forth herein, which is in actuality a conclusion of law, shall be deemed to constitute a conclusion of law.  Further, any conclusion of law, which is in actuality a finding of fact, shall be deemed to constitute a finding of fact.

## II.   **Conclusions of Law**

152.   Based upon the above findings of fact, and the applicable law, the Court renders the following conclusions of law:

(a.) Travel Caddy's '992 and '104 patents-in-suit are deemed to be unenforceable, and based upon:

    i.   Travel Caddy's withholding knowledge of the related litigation during pendency of the '104 patent;

    ii.   Travel Caddy's withholding of material prior art references during pendency of both the '992 and '104 patents;

    iii.   Travel Caddy's fraudulent claims of small entity status and fee payments in both the '992 and '104 patents;

    iv.   Travel Caddy's fraudulent claims of inventorship in both the '992 and '104 patents;

    v.   Travel Caddy's fraudulent claims of application priority in both the '992 and '104 patents,

    vi.   Travel Caddy's fraudulent execution of the patent declaration, and thus fraudulent claims of invention conception, in both the '992 and '104 patents; and,

vii. Travel Caddy's patent misuse in connection with Travel Caddy's post-issuance patent licensing conduct constituting the exacting of royalty payments for bag structures that are not covered by any of the claims of the '992 and '104 patents.

(b.) The claims of Travel Caddy's '992 and '104 patents-in-suit are deemed to be invalid, and specifically for the following reasons:

viii. Claims 5, 12, 23 and 30 of the '104 patent are invalid pursuant to the provisions of 35 U.S.C. § 112;

ix. Claims 5, 12, 23 and 30 of the '104 patent are invalid pursuant to the provisions of 35 U.S.C. § 102(b) and § 102(f); and,

x. All of the claims of the '992 patent (i.e., Claims 1-4) and the remaining claims of the '104 patent (i.e., Claims 1-4, 6-11, 13-22, 24-29, and 31-32) are invalid for obviousness pursuant to the provisions of 35 U.S.C. § 103.

(c.) Based upon Travel Caddy's inequitable conduct, this case is deemed to be an "exceptional case" pursuant to the provisions of 35 U.S.C.

§ 285, and the appropriate sanctions for which, if any, will be determined pursuant to a further Order of the Court.

SO ORDERED, THIS _____ day of _____, 20_____.


_____
Honorable Orinda D. Evans
United States District Judge

Respectfully submitted this 21st day of March, 2008.


/Ashish D. Patel/
Ashish D. Patel
Georgia Bar No. 565894
Robert M. Ward
Georgia Bar No. 775401


Myers & Kaplan
Intellectual Property Law, L.L.C.
3100 Cumberland Boulevard Suite 1400
Atlanta, GA 30339
Tel. (770) 541-7444
Fax  (770) 541-7448
Counsel for Union Rich *et al.*

## **CERTIFICATION**

Pursuant to Local Rule 7.1D, counsel for Union Rich *et al.* hereby certifies

that this document has been prepared in Times New Roman Font in 14 point type.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing ***Union Rich et al.'s Amended Proposed Findings of Fact and Conclusions of Law*** was electronically filed via CM/ECF in the United States District Court for the Northern District of Georgia, with notice of same being electronically served by the Court to the following:

> G. Melton Mobley, Jr., Esq.
> Jon O. Nelson, Esq.
> Scott Burow, Esq.
> Aimee B. Kolz, Esq.
> Marc S. Cooperman, Esq.

Respectfully submitted this 21st day of March, 2008.

> /Ashish D. Patel/
> Ashish D. Patel
> Georgia Bar No. 565894
> Robert M. Ward
> Georgia Bar No. 775401

Myers & Kaplan
Intellectual Property Law, L.L.C.
3100 Cumberland Boulevard Suite 1400
Atlanta, GA 30339
Tel. (770) 541-7444
Fax  (770) 541-7448
Counsel for Union Rich *et al.*