# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| **OUTSIDE THE BOX INNOVATIONS, LLC,** <br> **d/b/a UNION RICH USA** | ) <br> ) <br> ) |
| **Plaintiffs/Counter-Defendants,** | ) |
| **v.** | ) **Civil Action No.** <br> ) **1:05-cv-2482-ODE** <br> ) |
| **TRAVEL CADDY, INC., and** <br> **ROOSTER PRODUCTS** <br> **d/b/a THE ROOSTER GROUP** | ) **Judge Orinda D. Evans** <br> ) <br> ) <br> ) |
| **Defendants.** | ) |
| ――――――――――――――――――――― | ) <br> ) |
| **TRAVEL CADDY, INC.,** | ) <br> ) |
| **Counter-Plaintiffs/Counter-Defendants,** | ) <br> ) |
| **v.** | ) <br> ) |
| **OUTSIDE THE BOX INNOVATIONS, LLC,** <br> **d/b/a UNION RICH USA,      et al.** | ) <br> ) <br> ) |
| **Counter-Defendants,** | ) <br> ) |
| ――――――――――――――――――――― | ) |

# TRAVEL CADDY'S PROPOSED FINDINGS OF FACT AND
# CONCLUSIONS OF LAW

During the bench trial on February 4 and 5, 2008 , Union Rich failed to meet its burden of proof of clear and convincing evidence in regard to each one of its allegations because it offered this Court attorney argument and little else.  As this Court acknowledged during the bench trial, attorney argument is not evidence.  *See* Hearing Transcript p. 191; *Truswal Sys. Corp. v. Hydro-Air Eng'g, Inc.*, 813 F.2d 1207, 1211 (Fed. Cir. 1987) (stating, "[w]e reject the unsupported statements of counsel . . . .  <u>*Arguments of counsel are not evidence*</u>."(emphasis added)). The Federal Circuit has explained that "[u]nsubstantiated attorney argument regarding the meaning of technical evidence is no substitute for competent, substantiated expert testimony."  *Invitrogen Corp. v. Clontech Labs. Inc.,* 429 F.3d 1052, 1068 (Fed. Cir. 2005); *see also Floe Intern., Inc. v. Newman's Mfg. Inc.*, No. 04-5120, 2006 WL 14560, at *1 (D. Minn. Jan. 3, 2006) (in denying accused patent infringer's motion for summary judgment of anticipation and obviousness, the court noted that the accused infringer had "cited various prior art references and attorney argument, without providing <u>*evidentiary support as to why these prior art references anticipate*</u>" the patent in suit (emphasis added)).

Further, the Federal Circuit has ruled that district courts err when they rely on "counsel's 'testimony'" because counsel is not under oath and not subject to

cross-examination.  *See Panduit Corp. v. Dennison Mfg. Co.*, 774 F.2d 1082, 1095 (Fed. Cir. 1985), *vacated on other grounds*, 475 U.S. 809 (1986).

In the present case, Union Rich—the party who bears the burden of proving *all* of its claims by clear and convincing evidence—merely provided "attorney testimony" for nearly its entire case when it stood at the podium and "testified" to its arguments.  Such attorney argument is not evidence and should be disregarded. For the Court's convenience, Travel Caddy provides in Exhibit A an identification of each instance where Union Rich merely provided attorney argument and no potentially admissible evidence to support its arguments.

Travel Caddy submits the following proposed findings of fact and conclusions of law.

# TABLE OF CONTENTS

## PROPOSED FINDINGS OF FACT

I.   INTRODUCTION ...................................................................................5

II.   THE PARTIES ......................................................................................5

III.   ENFORCEABILITY OF THE PATENTS IN SUIT .................................8

IV.   PATENT MISUSE ...............................................................................30

V.   VALIDITY OF THE PATENTS IN SUIT ...............................................31

## CONCLUSIONS OF LAW

VI.   ENFORCEABILITY OF THE PATENTS IN SUIT ................................44

VII.   VALIDITY OF THE PATENTS IN SUIT ..............................................67

<u>PROPOSED FINDINGS OF FACT</u>

## I.   INTRODUCTION

1.      This is an action for patent infringement involving U.S. Patent Nos. 6,823,992 and 6,991,104. (Second Amended Answer and Counterclaim, Ct. Dkt. No. 63, ¶¶ 11-24.)

## II.   THE PARTIES

2.      Outside the Box Innovations, LLC d/b/a Union Rich USA is a Florida limited liability company with its principal place of business at 1301 West Copans Road, Building G, Suite 9, Pompano Beach, Florida 33064.  Union Rich distributes the products accused of infringement in this case to retailers, including Home Depot USA, Inc. ("Home Depot").  (Complaint, Ct. Dkt. No. 1, ¶¶ 5-6.)

3.      Union Rich Plastic Factory, Ltd. has its principal place of business at Unit A&B, 8/F Unison Industrial Centre, 27-31 Au Pui Wan Street, Fo Tan, Shatin, Hong Kong.  Union Rich Plastic Factory manufactures the products accused of infringement in this case.  (Reply to Counterclaim, Ct. Dkt. No. 20, ¶ 3.)

4.      Bonaka Plastic Manufacturing Co., Ltd. has its principal place of business at Shang Xin Village, Shajing, Baoan County, Shenzhen, P.R.C.  Bonaka

Plastic Manufacturing Co., Ltd. manufactures the products accused of infringement in this case.  (Reply to Counterclaim, Ct. Dkt. No. 20, ¶ 5.)

5.     Bonaka Limited has its principal place of business at Unit A&B, 8/F Unison Industrial Centre, 27-31 Au Pui Wan Street, Fo Tan, Shatin, Hong Kong. Bonaka Limited is related to Union Rich Plastic Factory, Ltd. and Bonaka Plastic Manufacturing Co., Ltd.

6.     Union Rich USA, Union Rich Plastic Factory, Bonaka Plastic and Bonaka Limited will be referred to collectively as "Union Rich."

7.     Travel Caddy, Inc. d/b/a Travelon ("Travel Caddy") is an Illinois Corporation with its principal place of business at 700 Touhy Avenue, Elk Grove Village, Illinois 60007.  (Second Amended Answer and Counterclaim, Ct. Dkt. No. 63-1, ¶ 7.).  Travel Caddy is a leading designer, developer and manufacturer of, *inter alia*, tool bags, cases and accessories.  (Second Amended Answer and Counterclaim, Second Amended Counterclaim, Ct. Dkt. No. 63-1, ¶ 1.)

8.     Rooster Products International d/b/a The Rooster Group ("Rooster") is a Texas Corporation with its principal place of business at 17280 N. Green Mountain Road, San Antonio, Texas 78247.  (Second Amended Answer and Counterclaim, Ct. Dkt. No. 63-1, ¶ 8.).  Rooster is a distributor that buys and

resells Travel Caddy's products.  *See* Order, Ct. Dkt. No. 392, p. 15, March 27, 2007.

9.     Travel Caddy owns two U.S. patents involved in this suit:  (1) U.S. Patent No. 6,823,992 ("the '992 patent"), issued on November 30, 2004; and (2) U.S. Patent No. 6,991,104 ("the '104 patent"), issued on January 31, 2006. (Second Amended Answer and Counterclaim, Ct. Dkt. No. 63, ¶ 12, ¶ 19.)

10.     Travel Caddy makes, and Rooster sells on its behalf, at least two commercial embodiments of the inventions claimed in the '104 and '992 patents; namely, the Electrician's Tote and the Plumber's Tote.  *See* Order, Ct. Dkt. No. 392, p. 15, March 27, 2007

11.     Union Rich manufactures, imports, offers to sell and sells the Husky ProTool Bag, Husky Electrician CarryAlls Bag I and II, Johnson Level Contractor's Bag and Johnson Level Electrician's Bag that are accused of infringement in this case.

12.     Union Rich has stipulated to the infringement of the Husky Electrician CarryAlls Bag I.  *See* Union Rich's Proposed Findings of Fact, Ct. Dkt. No. 478, ¶ 12.

7

## III.   ENFORCEABILITY OF THE PATENTS IN SUIT

### DISCLOSURE OF LITIGATION

13.     On November 4, 2004, Travel Caddy filed an application for a continuation of the '992 patent that would eventually issue as the '104 patent.  *See* DTX 3, '104 patent.

14.     On September 23, 2005, Union Rich filed a declaratory judgment action wherein Union Rich requests the Court to declare the '992 patent not infringed.  Union Rich did not allege invalidity or inequitable conduct.  *See* DTX 47, Complaint, Ct. Dkt. No. 1.

15.     On November 11, 2005, Travel Caddy filed its Answer and Counterclaim with the Court, alleging infringement of the '992 patent.  *See* Answer and Counterclaim, Ct. Dkt. No. 11.

16.     On December 5, 2005, Union Rich filed its Reply with no allegations of invalidity or inequitable conduct.  *See* Reply to Counterclaim, Ct. Dkt. No. 20.

17.     On December 9, 2005, Union Rich and Travel Caddy filed a Joint Preliminary Report and Discovery Plan.  *See* PX 12, Joint Preliminary Report and Discovery Plan, Ct. Dkt. No. 22.

18.     In the Joint Preliminary Report, Union Rich describes the nature of the action as a case about infringement and unfair competition.  PX 12, Ct. Dkt.

No. 22, at p.1 ("Plaintiff seeks a judicial declaration that none of its activities constitute infringement," and "Additionally, Plaintiff asserts unfair competition and deceptive trade practice claims . . . ."). There is no mention of the issue of validity or enforceability in the "nature of the action." *Id.*; *see also* Hearing Transcript p. 241.

19.   The Joint Preliminary Report also summarizes the facts of the case, as they were at the time the document was created, and in that summary, there is no reference to the issue of validity or enforceability. *Id.* at p. 2.; *see also* Hearing Transcript p. 241.

20.   The Joint Preliminary Report also discusses the subject of whether the parties planned on making any amendments to the pleadings in the case. *Id.* at p. 5. The only statement under this heading recites that "Defendants [Travel Caddy] are contemplating two amendments, one to join additional parties and a second, after the anticipated imminent issuance of another patent, an additional infringement counterclaim." *Id.* at p. 6. There is no statement that the "Plaintiff," Union Rich, was contemplating any amendments to the pleadings let alone amendments adding claims relating to validity or enforceability. *Id.*, *see also* Hearing Transcript p. 242-43.

21.     Jon Nelson, Travel Caddy's counsel, testified that he did not recall any discussions concerning validity or Union Rich having plans to plead invalidity at the required conference that occurred on December 8th, 2005, from which the Joint Preliminary Report and Discovery Plan was prepared.   *See* Hearing Transcript p. 242.

22.     Though the Joint Preliminary Report makes passing reference to validity, there is no evidence that any party believed validity was at issue in the '992 patent litigation.   Mr. Nelson's testimony at the evidentiary hearing confirms this and the document itself indicates in all respects that validity was not then, and was not anticipated to be, actually at issue during the '992 litigation.   *See* Hearing Transcript pp. 241-44; *see also* PX 12, Ct. Dkt. No. 22.

23.     Approximately four days (just 1 business day) after having filed the Joint Preliminary Report and Discovery Plan, on December 13, 2005, Union Rich served Travel Caddy with a document entitled "Plaintiff's Initial Disclosures." DTX 244, Plaintiff's Initial Disclosures.   The first heading in that document recites, "***State precisely the classification of the cause of action being filed***, a brief factual outline of the case ***including plaintiff's contentions as to what defendant did or failed to do***, and ***a succinct statement of the legal issues in the case***."   *Id.* at p. 1 (emphasis added).   Union Rich stated "Plaintiff seeks a judicial

10

declaration that none of its activities constitute infringement of the '992 patent." *Id.* Nowhere within that document, however, does Union Rich ever assert any claims of invalidity or unenforceability nor are those terms even mentioned.

24.     Union Rich's "Invalidity Contentions" are notably silent on invalidity contentions.  Union Rich cited no allegedly invalidating prior art.  Union Rich offered no alleged arguments of invalidity.  Importantly, in its January 10, 2006 "Invalidity Contentions," Union Rich declares that: "This declaratory judgment action *has not* been motivated by any contention that the '992 patent is invalid . . . ."  DTX 49, Plaintiff's Invalidity Contentions, Ct. Dkt. No. 30, pp. 1-2 (emphasis added).

25.     On January 31, 2006, the '104 patent issued.  *See* DTX 4, '104 patent.

26.     In March of 2006, Union Rich first served a list of terms allegedly needing construction.  *See* Certificate of Service, Ct. Dkt. No. 39.

27.     On April 25, 2006, nearly three months after the '104 patent issued, Union Rich filed its Answer to Second Amended Counterclaim asserting, *inter alia*, patent invalidity.  *See* Answer to Second Amended Counterclaim, Ct. Dkt. No. 71.  This is the first time that Union Rich raised any issue related to patentability, invalidity or unenforceability.  *See id.*

11

28.     From the beginning of this litigation on September 23, 2005 through January 31, 2006, Union Rich asserted no claims of patent invalidity, enforceability.  Rather Union Rich had made an affirmative representation to this Court that it had not initiated the action to challenge patent validity.  *See* DTX 49, Plaintiff's Invalidity Contentions, Ct. Dkt. No. 30, pp. 1–2.  Likewise, during that time, Union Rich provided no claim construction allegations to Travel Caddy relating to the patents-in-suit.

29.     At all relevant times, there were no Court decisions or contentions from Union Rich, arguably relating to patentability, invalidity or unenforceability.  Accordingly, as of the date of the issuance of the '104 patent, this litigation provided no arguably material information for Travel Caddy to disclose to the Patent Office.

30.     Mr. Nelson is a patent attorney with over 40 years of experience.  *See* PX 46.   While not being able to specifically recall whether he considered the issue, base on his regular practices, Mr. Nelson believed that during the prosecution of the '104 patent he considered whether or not to send to the Patent Office papers filed in the '992 litigation or to notify the Patent Office of the existence of the '992 litigation itself.  Hearing Transcript p. 225-30.

12

31.    During the relevant period from the filing of the complaint in the '992 litigation to the issuance of the '104 patent, Mr. Nelson believed that this litigation involved did not involve any claims of invalidity or enforceability.    Hearing Transcript p. 250-51.    Mr. Nelson believed that he concluded that the mere existence of the litigation, without any claims or contentions of invalidity or unenforceability, and in which neither the complaint nor Union Rich's filed validity contentions raised any issues related to patentability, was not material information. *See* Hearing Transcript p. 227-30; PX 52, Ct Dkt. No. 461, Nelson Dep. Transcript, p. 170, line 24–25, p. 171, line 1–15, p. 172, line 1–25.

32.    Mr. Nelson believed that the rules did not call for disclosure of the pending litigation to the Patent Office because there were no issues of patentability, invalidity or unenforceability at that time.    Ct Dkt. No. 461, Nelson Dep. Transcript, p. 170, line 24–25, p. 171, line 1–15, p. 172, line 1–25.

33.    This Court finds that Mr. Nelson was not, in any way, trying to deceive the Patent Office.    Union Rich provides no evidence to the contrary.

34.    Mr. Nelson correctly understood that there were no issues related to patentability, invalidity or unenforceability in the case during the period leading up to the issuance of the '104 patent.    Mr. Nelson's good faith belief in the immateriality of the '992 patent litigation was based, in large part, on Union Rich's

13

"Invalidity Contentions," wherein Union Rich stated that there were no claims of invalidity in this case.  Hearing Transcript p. 227-30; Ct Dkt. No. 461, Nelson Dep. Transcript, p. 286, line 8–25, p. 287, line 1–16.

35.    Mr. Nelson was unaware of any Union Rich invalidity argument prior to April 25, 2006, when Union Rich filed its Answer to Second Amended Counterclaim.  Union Rich filed this paper, for the first time alleging invalidity approximately three months *after* the '104 patent issued.  *See* Hearing Transcript p. 249-51; Ct Dkt. No. 461, Nelson Dep. Transcript, p. 283, line 5–25, p. 284, line 1–17.  Because Union Rich did not provide any invalidity or unenforceability arguments prior to the issuance of the '104 patent, there was no material information for Mr. Nelson to disclose.

36.    On at least two occasions before the issuance of the '104 patent Mr. Nelson asked Union Rich to identify any allegedly relevant prior art, so he could bring it to the attention of the patent examiner.  *See* Hearing Transcript p. 209-13, DTX 138 (2/1/05 Nelson Letter); Hearing Transcript p. 217-20, DTX 140 (5/19/05 Nelson Letter).

37.    In February 2005, Mr. Nelson sent Mandy Wilson, Union Rich's counsel at the time, a letter informing her that the '104 patent application claims had been allowed and requesting that Union Rich disclose any prior art Union Rich

14

was aware of that could affect the '992 patent and as a result, the '104 patent's prosecution.  *See* Hearing Transcript p. 209-13, DTX 138 (2/1/05 Nelson Letter).

38.     On May 19, 2005, Mr. Nelson again requested that Union Rich disclose any relevant prior art and any invalidity or enforceability defenses so that Mr. Nelson could disclose them to the PTO.  *See* Hearing Transcript p. 217-20, DTX 140 (5/19/05 Nelson Letter).

39.     Mr. Nelson sent these letters, in part, to try and find any relevant material prior art that could be of importance to the Patent Office Examiner charged with examining the then-pending '104 patent so that if there was relevant, material prior art, he could send that prior art to the Examiner.   *See* Hearing Transcript p. 209-11.  Mr. Nelson testified, "my thought was I wanted to get any information that they had that might reflect on patentability and bring it to the attention of the patent office . . . ."  Hearing Transcript p. 210.  By informing the Examiner of any prior art Union Rich may have been aware of that was possibly material, Travel Caddy could ensure the Examiner reviewed that art, thus strengthening the patent.  *See* Hearing Transcript p. 211-12.

40.     Union Rich responded to Mr. Nelson's first letter acknowledging that Union Rich's counsel, at the time, Ms. Decker, had reviewed the claims of the '992 and then-pending '104 patents.  *See* Hearing Transcript p. 215.  Union Rich

did not respond to Mr. Nelson's first request for prior art, however, nor did it even acknowledge his request. *See* Hearing Transcript p. 215-16; DTX 139; Ct Dkt. No. 461, Nelson Dep. Transcript, p. 287, line 17–25, p. 288, line 1–19. Likewise, Union Rich did not respond to Mr. Nelson's second request for prior art. *See* Hearing Transcript p. 220; DTX 141.

41.     Mr. Nelson made Union Rich aware of the fact that there was a pending continuation application—which was to become the '104 patent—well prior to the filing of the lawsuit and Mr. Nelson even sent Ms. Decker copies of the then-pending claims of the '104 patent in his February 1, 2005 letter. *See* DTX 138; Hearing Transcript pp. 212-14.

42.     On January 5, 2005, prior to Mr. Nelson sending the first two letters to Union Rich requesting prior art from Union Rich, Union Rich's counsel, Ms. Decker, had already communicated to Union Rich an opinion regarding the validity of the '992 patent. *See* DTX 135; Hearing Transcript pp. 247-49. In that opinion letter, Ms. Decker indicated that a patent search had uncovered 40 prior art patents. DTX 135 at p. 3. Union Rich did not send this prior art in its possession to Mr. Nelson or Travel Caddy, despite Travel Caddy's repeated requests to Union Rich for potentially relevant prior art. *See* Hearing Transcript pp. 247-48.

43.     In her opinion letter to Union Rich, Ms. Decker stated that there was not a good argument for invalidity of the '992 patent, either under obviousness or anticipation.  DTX 135 at p. 11; Hearing Transcript p. 248.

## DISCLOSURE OF PRIOR ART

44.     In 2001, Travel Caddy filed an unrelated patent application directed to an expandable storage and carrying case with mesh side panels—essentially a fishing tackle bag.  This application eventually issued in 2003 as U.S. Patent No. 6,595,687 ("the '687 patent").  *See generally* DTX 6; DTX 7.

45.     During the prosecution of the '687 patent application, the Examiner issued an office action rejecting the patent application.  The examiner used only one, single reference—U.S. Patent No. 3,031,121 ("Chase").  *See* DTX 7, pp. 49-54 (September 26, 2002 Office Action).  The rejection was directed to only one, single applied-for claim.  *Id.*

46.     In the office action, the Examiner also provided a listing of 17 prior art references.  Again, the only listed reference to which the Examiner referred in the office action was the Chase reference.  *See* DTX 6, the '687 patent ("References Cited").

47.     Among the 17 references listed was U.S. Patent No. 2,960,136 ("Ziff").  Ziff was merely a name in a long list of references cited by the Examiner

17

during the prosecution of the '687 patent.  It was not one of the primary references, and there was no substantive discussion about the Ziff reference in the Patent Office record.  *See id.*; Hearing Transcript pp. 265-68.

48.    The Examiner did not actually rely upon the Ziff reference in making any rejections.  *See* DTX 7, pp. 49-54 (September 26, 2002 Office Action); Hearing Transcript pp. 265-68.

49.    The Ziff reference is classified in the Patent Office under class 190, subclass 106, which is different from the '992 patent which is in class 206, subclass 373.  *See* Hearing Transcript p. 261-63; DTX 1 ("Related U.S. Application Data").  There is no overlap in classification between the '992 patent and Ziff.  *See* Hearing Transcript p. 262.

50.    The '992 and '104 patents teach substantially different inventions from those taught in Ziff and the '687 patent.  The '687 patent discloses a tackle box.  Ziff is directed to an insulated carrying case designed to sit in an upright position when the bag is open, but to have sides that may be inclined inwardly to close the bag at the top of the bag.  *See* PX 11, Ziff, Col. 1, ll. 18-23.  The '687 patent is not a divisional, a child, or a parent application of any of the patents-in-suit.  *See* Hearing Transcript p. 254.  It is not related in any way to the '992 or '104 patents.  *Id.*

51.     Ziff and the '687 patent fail to disclose several elements of the '992 and '104 patents including a single, continuous, closed-loop binding joining panels as claimed, and a generally rigid bottom panel to form a generally three sided, generally rigid, fabric box.   *See* DTX 3, '104 patent; DTX 1, '992 patent. Specifically, Ziff fails to teach the following limitations found in the claims of the '104 and '992 patents:

- a "single continuous, closed loop binding" or "continuous, closed loop binding" joining the panels as claimed. (*See* DTX 3, '104 patent, cls. 1, 8, 19 and 26; *see also* Hearing Transcript p. 269-70)
- generally rigid, fabric covered end panels (*See* DTX 3, '104 patent, cls. 1, 8, 19 and 26)
- flexible, fabric front and back panels (*See* DTX 3, '104 patent, cls. 1, 8, 19 and 26; *see also* Hearing Transcript p. 269-70)
- a  . . generally rigid fabric covered bottom panel to form a generally three sided, generally rigid, fabric covered box.  (*See* DTX 3, '104 patent, cls. 1, 8, 19 and 26)
- a generally rigid handle member connecting the first and second end panels.  (*See e.g.,* DTX 3, '104 patent, cl. 21)
- rigid reinforcing bridging elements fitted over at least a part of the first end panel and the second end panel.  (*See e.g.,* DTX 3, '104 patent, cl. 23)
- reinforcing member sewn into the flexible fabric front and back panels.  (*See e.g.,* DTX 3, '104 patent, cl. 20, 27)
- handle member connecting the first and second end panels.  (*See e.g.,* DTX 3, '104 patent, cl. 28).
- a "single continuous, closed loop binding" joining the panels as claimed. (*See* DTX 1, '992 patent, cl. 1; *see also* Hearing Transcript p. 269-70)
- generally rigid, fabric covered end panels (*See* DTX 1, '992 patent, cls. 1 and 4)

- a . . . generally rigid, fabric covered . . . bottom panel . . . to form a generally three sided, generally rigid, fabric covered box.  (*See* DTX 1, '992 patent, cls. 1 and 4)
- flexible, fabric front and back panels (*See* DTX 1, '992 patent, cls. 1 and 4; *see also* Hearing Transcript p. 269-70)
- a reinforcing member sewn into the flexible fabric panels intermediate the end panels.  (See DTX 1, '992 patent, cl. 2)

52.     These difference between Ziff and the claims of the patents-in-suit establish that Ziff was not a material reference.

53.     Further, Ziff and the '687 patent were both ***cumulative*** of the prior art of which the examiner was already aware.

54.      The '687 patent is cumulative of United States Patent No. 6,237,761 ("the '761 Patent") which was considered by the Examiner during the prosecution of the patents-in-suit.  The '761 patent teaches the use of binding that joins fabric layers.  *See* DTX 22 (FIG. 5 of the '761 patent shows binding that joins fabric layers); Hearing Transcript pp. 282-84.   In fact, the '687 patent would have been far less useful as a reference to the Patent Office Examiner in the prosecution of the patents-in-suit than the '761 patent.  *See* Hearing Transcript p. 283.

55.     Ziff at most teaches continuous beading which is cumulative of several references including the '761 patent and United States Patent No. 5,356,004 ("Weinreb").  *See* DTX 22 (FIG. 5 of the '761 patent shows continuous

beading); FIGs. 2–12 of Weinreb (a cited reference in the patents-in-suit) show continuous beading; Hearing Transcript p. 269-73.  Further, Ziff teaches ***four*** strips of beading to join the plastic panels in Ziff, and not a "single, continuous closed loop binding."

56.    The fact that these two references were cited by the examiner of the later-filed U.S. Patent Application Serial No. 11/340,261, now U.S. Patent No. 7,314,134 ("the '134 patent"), is irrelevant.  As an initial matter, the claims rejected during prosecution of the '134 patent contained a different combination of features than those in the '992 and '104 patents.  *See* Hearing Transcript pp.274-78.  Further, because these references are cumulative, the Patent Office Examiner of the '134 patent was free to cite to these references or, in the alternative, to the references previously cited to during the examination of the '992 and '104 patents.

57.    Because these references are immaterial under either the "reasonable examiner" standard or the narrower amended Rule 56 standard, Union Rich's claim of inequitable conduct for failure to submit them to the Patent Office fails.

58.    In Mr. Nelson's typical practice, he reviews only those references used by the examiner in rejecting claims in an Office Action—as opposed to those merely cited but not relied upon.  That is because those are the references the applicant or Mr. Nelson will have to address to obtain an issued patent  *See*

21

Hearing Transcript pp. 265-68; Ct Dkt. No. 461, Nelson Dep. Transcript, p. 277, line 24–25, p. 278, line 1–25, p. 279, line 1–25, p. 280, line 1–18.

59.     Although Mr. Nelson could not recall, he believed that it would have been highly unlikely that he would have seen Ziff at all during the prosecution of the '687 patent.  *See* Hearing Transcript pp. 265-68; Ct Dkt. No. 461, Nelson Dep. Transcript, p. 280, line 19–25, p. 281, line 1–25.   Again, this is because the Examiner did not use Ziff as a reference to reject any claims during prosecution.  It was merely one of 17 patents listed in the list of references cited, which was a single page attached to the Examiner's office action.  DTX 7, pp. 49-54 (Office Action).

60.     Because the Examiner did not rely on Ziff, Mr. Nelson believed that he did not read or send Ziff to the client during the prosecution of the '687 patent. *See* Hearing Transcript pp. 265-68.

61.     Mr. Nelson did not prosecute or write Ziff.  *See* Hearing Transcript pp. 265-68.

62.     Thus, Travel Caddy had no "actual knowledge" of the Ziff reference—or any reference for that matter—during the prosecution of the patents in question.

63.    Travel Caddy had no "actual knowledge" of United States Patent No. 6,161,665 ("Hoover") during the prosecution of the patents-in-suit.   There is no evidence that Travel Caddy was aware of Hoover's existence prior to Union Rich's allegations of invalidity.

64.    Over his 40 plus-year career, Mr. Nelson has prosecuted roughly 50 patents per year.   *See* Hearing Transcript pp. 200-01.

## SMALL ENTITY STATUS

65.    This Court in its March 27, 2007 Order, already ruled that the agreement between Travel Caddy and Rooster was not an exclusive license agreement.   *See* Order, Ct. Dkt. No. 392, p. 15, March 27, 2007 ("The agreement between Travel Caddy and Rooster does no appear to provide Rooster with a divisible patent right.").   The agreement between Travel Caddy and Union Rich was entered into on or about August 15, 2000—more than two years prior to the filing of the '992 patent, so it could not have conveyed patent rights in those patents.   *See* PX 25.   Further, the agreement covered a category of products, both patented and unpatented.   *Id.*   The agreement did not, as Union Rich argues, "grant, convey or otherwise license at least one of the divisible patent rights to '[the] '992 and '104 patents."

66.     This Court previously rejected Union Rich's argument that Rooster is an exclusive licensee of a divisible patent right in the patents-in-suit.  *See id.*  The Court interpreted the agreement between Travel Caddy and Rooster as an agreement whereby "Rooster purchases patented products from Travel Caddy and then resells the products."  *Id.*  The Court thus held that "Rooster is not an exclusive licensee of a divisible patent right of the patents-in-suit."  *Id.* at p. 17.

67.     Travel Caddy, not Rooster, marks the products that Travel Caddy sells to Rooster.  *See* Hearing Transcript p. 177.

### REMAINING ALLEGATIONS

68.     Travel Caddy developed the subject matter as disclosed in the '992 patent at least as early as March 20, 2002.  PX 7, Serial No. 60/365,966

69.     Travel Caddy filed a provisional patent application on March 20, 2002 that disclosed, among other things, the combination of a continuous binding with various panel constructions.  *Id.*

70.     On October 4, 2002, Travel Caddy received a purchase order for its 16" Carpenter Plumber Tote from Rooster.  *See* DTX 166 (Purchase Order TC001599); DTX 165 (Packing List and Invoice TC000996).

71.     By November 21, 2002, Travel Caddy had shipped a portion of that order to Rooster.  *See id*.

72.     Travel Caddy has maintained an actual physical Plumber's Tote sample dated November 23, 2002.  *See* DTX 38.  .

73.     The '992 patent was filed March 20, 2003.  *See* DTX 2, '992 patent.

74.     The '104 patent was filed November 4, 2004.  *See* DTX 3, '104 patent.

75.     The bridging elements as disclosed and described in the '992 patent specification teach a functional bag.  The specification of the '992 patent discloses that the embodiments disclosed in FIGS. 10 and 11 also include "bridging elements, and more particularly a first bridging element 230 which fits over the truncated or generally triangular end portion 232 of the first end panel 222."  *See* DTX 1, '992 patent, col. 6, ll. 23–27.  The '992 patent specification further describes a second bridging element which fits over the opposite end portion.  *See* DTX 1, '992 patent, col. 6, ll. 27–29.  These bridging elements add reinforcement to the end panels and overall construction of the bag.

76.     Mr. Redzisz did conceive and reduce to practice that which is shown in FIGs. 10 and 11 and described in the specification as early as at least the time of the filing of the application that became the '992 patent.

77.     The specifications of the '992 and '104 patents are largely identical.

78.     Claims 5, 12, 23, and 30 of the '104 patent are directed to a case having "rigid reinforcing bridging elements fitted over at least a part of the first end panel and the second end panel," and are supported by the '992 specification and thus, properly claim priority to the '992 patent.  In fact, the Examiner of the '104 patent acknowledged as much when he allowed the claims after Travel Caddy filed a terminal disclaimer—whereby the Patent Office essentially expresses that the claims are directed to the same subject matter that was disclosed in the '992 patent.  *See* Hearing Transcript pp. 307-10; DTX 4 at pp. 23-28.

79.     Union Rich not only acknowledged that the subject matter of the '992 and '104 patents are identical, Union Rich affirmatively argued it.   Union Rich affirmatively represented to this Court that the '104 and '992 disclosed the same subject matter when Union Rich argued during the evidentiary hearing that the patents are related for purposes of Union Rich's "inequitable conduct for failure to disclose related litigation" allegation.   *See* Hearing Transcript pp. 50-52.   When asked by this Court what the '104 patent added to the '992 patent, counsel for Union Rich represented, "It adds nothing in fact, your Honor, and essentially what the 104 is again it is a continuation.  ***It is the same patent as the 992***."  *Id.* at p. 50 (emphasis added).   When the Court asked counsel for Union Rich why Travel Caddy had filed the 104 patent if it was the same patent, Union Rich's counsel

represented to the Court, "When patent applicants file a continuation case, it's merely to secure additional claims ***on the exact same subject matter, common subject matter***." *Id.* (emphasis added).  Union Rich's counsel then summarized to this Court, "again, your Honor . . .  [the '104 patent is] the same subject matter . . . ***They're all the same patent***." *Id.* at p. 52. (emphasis added).   Union Rich apparently weaves in and out of its understanding of the subject matter of the two patents-in-suit when convenient to its various allegations.

80.    Union Rich raised the "bridging elements" argument for the first time at the bench trial.   Union Rich's argument concerning the meaning of "bridging elements" should have been raised prior to the *Markman* hearing when this Court was considering the scope and meaning of the claims of the patents.

81.    In any event, even without a claim construction, Union Rich's "bridging elements" argument regarding lack of written description fails.   Claims 5, 12, 23, and 30 of the '104 patent are directed to a case having "rigid reinforcing bridging elements ***fitted over at least a part*** of the first end panel and the second end panel."  "Fitted over at least a part of" is exactly what is shown in FIGs. 10 and 11, and is described in the '992 specification.   FIGs. 10 and 11 and the accompanying description in the specification show bridging elements that are

27

fitted over at least a part of the first end and the second end.  Thus, there is support in the specification for this claimed feature.

82.   Even assuming, *arguendo*, Union Rich's litigation-created construction of the claim term "bridging elements" to encompass "entirely around" were entertained, claims 5, 12, 23 and 30 of the '104 patent would still find sufficient support in the written description of the '992 patent.

83.   The specification of the '992 patent would reasonably convey to a person skilled in the art that the patentee had possession of the subject matter disclosed in claims 5, 12, 23, and 30 of the '104 patent—that the bridging elements can be placed over at least a part of, and up to entirely around the end panels—at the time of the filing of the '992 patent.  FIGs. 10 and 11 show the existence of bridging elements.

84.   There are no limiting statements in the specification of the '992 patent to indicate that the placement of the bridging elements as shown in FIGs. 10 and 11 was the "only feasible design" as contemplated by the inventor.  *See* '992 patent.  The specification does not indicate that the extent to which the bridging elements fit over the end panels was critical to the invention.  *See* '992 patent. Likewise, there are no statements in the specification that specifically distinguish prior art showing alternate placements of the bridging elements as inferior.  *See*

28

'992 patent.   In fact, the specification explicitly states that "[n]umerous modifications may be made to the construction without departing from the spirit and scope of the invention."  '992 and '104 patents, col. 6, ll. 59–60.

85.   Because claims 5, 12, 23, and 30 of the '104 patent are supported by the specification of the '992 patent, these claims are entitled to at least a filing date of March 20, 2003.  Any sales of products representing embodiments of the subject matter claimed in claims 5, 12, 23, and 30 of the '104 patent after March 20, 2002 (one year prior to that date) would not invalidate those claims under 35 U.S.C. § 102(b).

86.   The Patent Office Examiner that examined the application that ultimately issued as the '104 patent considered all of the claims and did not find that these claims added new matter unsupported by the specification.   *See generally* DTX 2; DTX 4.

87.   The Patent Office allowed all the claims of the '104 patent giving the claims the benefit of priority to the filing date of the '992 patent.  *See generally* DTX 2.

88.   On October 4, 2002, Travel Caddy received a purchase order for its 16" Carpenter Plumber Tote from Rooster.   *See* DTX 166 (Purchase Order TC001599); DTX 165 (Packing List and Invoice TC000996).

89.     By November 21, 2002, Travel Caddy had shipped a portion of that order to Rooster.  *See id*.  These commercial bags were embodiments of the subject matter as disclosed in claims 5, 12, 23, and 30 of the '104 patent.

90.     These sales were made less than one year prior to the March 20, 2003 filing date of the '992 patent and therefore cannot be considered invalidating sales under 35 U.S.C. § 102(b).

91.     Because the specification of the '992 patent sufficiently supports claims 5, 12, 23, and 30, and thus, those claims properly claim priority to the filing date of the '992 patent, there was no reason to disclose the October 4, 2002 sales of bags that represent embodiments of those claims because the sales occurred less than one year prior to the '992 patent filing date and thus were not invalidating events under 102(b).

## IV.   PATENT MISUSE

92.     The agreement (PX-26) by which Travel Caddy provides a license to Great Star to manufacture certain products was entered into in September, 2007 prior to any finding on the appealed claim construction of this Court.  At any rate, neither this Court, nor any other court has to this day made any findings regarding whether Great Star's products are covered by the '992 or '104 patents.

93.     This license was the product of a legitimate business transaction between two competent companies and it was entered into by both parties to achieve a mutually-beneficial commercial solution.  *See* Hearing Transcript p. 176.

94.     There is simply no evidence of patent misuse.

## V.     VALIDITY OF THE PATENTS IN SUIT

95.      Taking the asserted references one-by-one, it is clear that each one lacks many of the limitations disclosed in the claims of the '104 and '992 patents. *See Key Pharms. v. Hercon Labs. Corp.*, 161 F.3d 709, 714 (Fed. Cir. 1998) ("not unlike a determination of infringement, a determination of anticipation, as well as obviousness, involves two steps.  First is construing the claim . . . followed by, in the case of anticipation or obviousness, a comparison of the construed claim to the prior art.").

96.     The Ziff Reference is missing many of the limitations from the '104 patent including, among others:

- a "single continuous, closed loop binding" or "continuous, closed loop binding" joining the panels as claimed. (*See* DTX 3, '104 patent, cls. 1, 8, 19 and 26; *see also* Hearing Transcript p. 269-70)
- generally rigid, fabric covered end panels (*See* DTX 3, '104 patent, cls. 1, 8, 19 and 26)
- flexible, fabric front and back panels (*See* DTX 3, '104 patent, cls. 1, 8, 19 and 26; *see also* Hearing Transcript p. 269-70)

- a . . generally rigid fabric covered bottom panel to form a generally three sided, generally rigid, fabric covered box. (*See* DTX 3, '104 patent, cls. 1, 8, 19 and 26)
- a generally rigid handle member connecting the first and second end panels. (*See e.g.,* DTX 3, '104 patent, cl. 21)
- rigid reinforcing bridging elements fitted over at least a part of the first end panel and the second end panel. (*See e.g.,* DTX 3, '104 patent, cl. 23)
- reinforcing member sewn into the flexible fabric front and back panels. (*See e.g.,* DTX 3, '104 patent, cl. 20, 27)
- handle member connecting the first and second end panels. (*See e.g.,* DTX 3, '104 patent, cl. 28).

97.     Ziff is also missing many of the limitations of the '992 patent including, among others:

- a "single continuous, closed loop binding" joining the panels as claimed. (*See* DTX 1, '992 patent, cl. 1; *see also* Hearing Transcript p. 269-70)
- generally rigid, fabric covered end panels (*See* DTX 1, '992 patent, cls. 1 and 4)
- a . . . generally rigid, fabric covered . . . bottom panel . . . to form a generally three sided, generally rigid, fabric covered box. (*See* DTX 1, '992 patent, cls. 1 and 4)
- flexible, fabric front and back panels (*See* DTX 1, '992 patent, cls. 1 and 4; *see also* Hearing Transcript p. 269-70)
- a reinforcing member sewn into the flexible fabric panels intermediate the end panels. (*See* DTX 1, '992 patent, cl. 2).

98.     Thus, the Ziff Reference does not disclose each and every claim element of any claim in the '992 and '104 patents.

32

99.   United States Patent No. 6,161,665 ("Hoover") lacks several of the limitations of the '104 patent including, among others:

- a "single continuous, closed loop binding" or "continuous, closed loop binding" joining the panels as claimed. (*See* DTX 3, '104 patent, cls. 1, 8, 19 and 26)
- a planar, generally rigid . . . bottom panel between the first and second end panels to form a generally three sided, generally rigid, fabric covered box.  (*See* DTX 3, '104 patent, cls. 1, 8, 19 and 26)
- a generally rigid handle member connecting the first and second end panels.  (*See e..g.,* DTX 3, '104 patent, cl. 21)
- rigid reinforcing bridging elements fitted over at least a part of the first end panel and the second end panel.  (*See e.g.,* DTX 3, '104 patent, cl. 23)
- reinforcing member sewn into the flexible fabric front and back panels.  (*See e.g.* DTX 3, '104 patent, cls. 20and 27)
- handle member connecting the first and second end panels.  (*See e.g.,* DTX 3, '104 patent, cls. 28)

100.   Additionally, Hoover also lacks several limitations of the '992 patent including, among others:

- a "single continuous, closed loop binding" joining the panels as claimed. (*See* DTX 1, '992 patent, cl. 1)
- a . . . generally rigid, fabric covered . . . bottom panel . . . to form a generally three sided, generally rigid, fabric covered box.  (*See* DTX 1, '992 patent, cls. 1 and 4)
- a reinforcing member sewn into the flexible panels intermediate the end panels.  (*See* DTX 1, '992 patent, cl. 2)
- end panels that are triangular and flexible  (*See* DTX 1, '992 patent, cl. 4).

101.   Thus, United States Patent No. 6,161,665 to Hoover does not disclose

each and every claim element of any claim in the '992 and '104 patents.

102.   Like  Ziff  and  Hoover,  United  States  Patent  No.  5,813,445

("Christman")  also  fails  to  disclose  many  of  the  limitations  of  both  the  '992  and

'104  patents.    Specifically,  Christman  fails  to  teach  at  least  the  following

limitations of the '104 patent:

- a "single continuous, closed loop binding" or "continuous, closed loop binding" joining the panels as claimed. (*See* DTX 3, '104 patent, cls. 1, 8, 19 and 26)
- a . . . first end panel having a generally rigid lower section . . . and an upper section (*See* DTX 3, '104 patent, cls. 1, 8, 19 and 26)
- a second . . . end panel constructed substantially identical to the first end panel. (*See* DTX 3, '104 patent, cls. 1, 8, 19 and 26)
- a planar, generally rigid . . . bottom panel between the first and second end panels to form a generally three sided, generally rigid, fabric covered box. (*See* DTX 3, '104 patent, cls. 1, 8, 19 and 26)
- a generally rigid handle member connecting the first and second end panels. (*See e.g.*, DTX 3, '104 patent, cl. 21)
- rigid reinforcing bridging elements fitted over at least a part of the first end panel and the second end panel. (*See e.g.*, DTX 3, '104 patent, cl. 23)
- reinforcing member sewn into the flexible front and back panels. (*See e.g.*, DTX 3, '104 patent, cl. 27)
- handle member connecting the first and second end panels. (*See e.g.*, DTX 3, '104 patent, cl. 28)

103.   Christman also fails to teach a number of the limitations found in the

'992 patent including, among others:

34

- a "single continuous, closed loop binding" joining the panels as claimed. (*See* DTX 1, '992 patent, cl. 1)
- a . . . generally rigid, fabric covered . . . bottom panel . . . to form a generally three sided, generally rigid, fabric covered box.  (*See* DTX 1, '992 patent, cls. 1 and 4)
- a reinforcing member sewn into the flexible panels intermediate the end panels.  (*See* DTX 1, '992 patent, cl. 2)
- end panels that are triangular and flexible  (*See* DTX 1, '992 patent, cl. 4).

104.  Thus, United States Patent No. 5,813,445 to Christman does not disclose each and every claim element of any claim in the '992 and '104 patents.

105.  United States Patent No. 4,403,638 ("Baum") fails to disclose many of the limitations of the '104 patent including, among others:

- a "single continuous, closed loop binding" or "continuous, closed loop binding" joining the panels as claimed. (*See* DTX 3, '104 patent, cls. 1, 8, 19 and 26)
- a . . . first end panel having a generally rigid lower section . . . and an upper section (*See* DTX 3, '104 patent, cls. 1, 8, 19 and 26)
- a second . . . end panel constructed substantially identical to the first end panel.  (*See* DTX 3, '104 patent, cls. 1, 8, 19 and 26)
- a planar, generally rigid fabric covered bottom panel.  (*See* DTX 3, '104 patent, cls. 1, 8, 19 and 26)
- a generally rigid handle member connecting the first and second end panels.  (*See e.g.,* DTX 3, '104 patent, cl. 21)
- rigid reinforcing bridging elements fitted over at least a part of the first end panel and the second end panel.  (*See* DTX 3, '104 patent, cl. 23)
- reinforcing member sewn into the flexible fabric front and back panels.  (*See e.g.,* DTX 3, '104 patent, cl. 27)
- handle member connecting the first and second end panels.  (*See e.g.,* DTX 3, '104 patent, cl. 28).

106.   Baum likewise fails to disclose a number of the limitations found in the '992 patent including, among others:

- a "single continuous, closed loop binding" joining the panels as claimed. (*See* DTX 1, '992 patent, cl. 1)
- a . . . generally rigid, fabric covered . . . bottom panel . . . to form a generally three sided, generally rigid, fabric covered box.  (*See* DTX 1, '992 patent, cls. 1 and 4)
- a reinforcing member sewn into the flexible panels intermediate the end panels.  (*See* DTX 1, '992 patent, cl. 2)

107.   Thus, United States Patent No. 4,403,638 to Baum does not disclose each and every claim element of any claim in the '992 and '104 patents.

108.   United States Design Patent No. 474,897 ("Huang") does not include the following limitations as found in the '104 patent including, among others:

- a "single continuous, closed loop binding" or "continuous, closed loop binding" joining the panels as claimed. (*See* DTX 3, '104 patent, cls. 1, 8, 19 and 26)
- a planar, fabric covered first end panel having a generally rigid lower section . . . and an upper section.  (*See* DTX 3, '104 patent, cls. 1, 8, 19 and 26)
- a second planar, fabric covered end panel constructed substantially identical to the first end panel.  (*See* DTX 3, '104 patent, cls. 1, 8, 19 and 26)
- a first, flexible, fabric front panel.  (*See* DTX 3, '104 patent, cls. 1, 8, 19 and 26)
- a second, flexible, fabric back panel.  (*See* DTX 3, '104 patent, cls. 1, 8, 19 and 26)
- a planar, generally rigid fabric covered . . . bottom panel.  (*See* DTX 3, '104 patent, cls. 1, 8, 19 and 26)

- rigid reinforcing bridging elements fitted over at least a part of the first end panel and the second end panel.  (*See e.g.,* DTX 3, '104 patent, cl. 23)
- reinforcing member sewn into the flexible fabric front and back panels.  (*See e.g.,* DTX 3, '104 patent, cl. 27)

109.   Further, Huang fails to disclose at least the following limitations from the '992 patent:

- a "single continuous, closed loop binding" joining the panels as claimed. (*See* DTX 1, '992 patent, cl. 1)
- fabric covered panels (*See* DTX 1, '992 patent, cls. 1 and 4)
- a . . . generally rigid, fabric covered . . . bottom panel . . . to form a generally three sided, generally rigid, fabric covered box.  (*See* DTX 1, '992 patent, cls. 1 and 4)
- a reinforcing member sewn into the flexible panels intermediate the end panels.  (*See* DTX 1, '992 patent, cl. 2)
- fabric covered end panels that are triangular and flexible  (*See* DTX 1, '992 patent, cl. 4).

110.   Thus, United States Design Patent No. 474,897 to Huang does not disclose each and every claim element of any claim in the '992 and '104 patents.

111.   United States Patent No. 5,813,530 ("Kornblatt") does not include at least the following limitations as found in the '104 patent including:

- a "single continuous, closed loop binding" or "continuous, closed loop binding" joining the panels as claimed. (*See* DTX 3, '104 patent, cls. 1, 8, 19 and 26)
- a planar, fabric covered first end panel having a generally rigid lower section . . . and an upper section.  (*See* DTX 3, '104 patent, cls. 1, 8, 19 and 26)

- a second planar, fabric covered end panel constructed substantially identical to the first end panel. (*See* DTX 3, '104 patent, cls. 1, 8, 19 and 26)
- a first, flexible, fabric front panel. (*See* DTX 3, '104 patent, cls. 1, 8, 19 and 26)
- a second, flexible, fabric back panel. (*See* DTX 3, '104 patent, cls. 1, 8, 19 and 26)
- a planar, generally rigid fabric covered . . . bottom panel. (*See* DTX 3, '104 patent, cls. 1, 8, 19 and 26)
- rigid reinforcing bridging elements fitted over at least a part of the first end panel and the second end panel. (*See e.g.,* DTX 3, '104 patent, cl. 23)
- reinforcing member sewn into the flexible fabric front and back panels. (*See e.g.,* DTX 3, '104 patent, cl. 27)

112.   Further, Kornblatt fails to disclose at least the following limitations from the '992 patent:

- a "single continuous, closed loop binding" joining the panels as claimed. (*See* DTX 1, '992 patent, cl. 1)
- fabric covered panels (*See* DTX 1, '992 patent, cls. 1 and 4)
- a . . . generally rigid, fabric covered . . . bottom panel . . . to form a generally three sided, generally rigid, fabric covered box. (*See* DTX 1, '992 patent, cls. 1 and 4)
- a reinforcing member sewn into the flexible panels intermediate the end panels. (*See* DTX 1, '992 patent, cl. 2)
- fabric covered end panels that are triangular and flexible (*See* DTX 1, '992 patent, cl. 4).

113.   Thus, United States Patent No. 5,813,530 to Kornblatt does not disclose each and every claim element of any claim in the '992 and '104 patents.

114.   Because each of the above references fails to teach at least one of the claim limitations recited in both the '992 and '104 patent, Union Rich cannot prove invalidity based on anticipation.  *See Helifix Ltd.*, 208 F.3d at 1346 (an anticipatory reference must disclose each and every limitation).

115.   Relating to the obviousness inquiry, four factors, commonly known as the *Graham* factors, include: (1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the claimed invention and the prior art; (4) secondary considerations of nonobviousness (commercial success, long-felt but unresolved needs, failure of others, copying, and unexpected results).  *Graham v. John Deere Co of Kansas City*, 383 U.S. 1 (1966).   Union Rich provided little if any evidence concerning the *Graham* factors.

116.  The  prosecution  history  of  U.S.  Patent  Application  Serial  No. 11/340,261, now U.S. Patent No. 7,314,134 ("the '134 patent"), is irrelevant.  The claims rejected during prosecution of the '134 patent contained different combination of features than those in the '992 and '104 patents.  *See* Hearing Transcript pp. 274-78.   Travel Caddy never conceded that the Examiner's determinations regarding his rejections of the applied-for-claims in the '134 patent were correct or even remotely capable of being substantiated.  *See* Hearing Transcript pp. 274-78.  In order to promptly usher the '134 patent through the

prosecution process, Travel Caddy declined to argue over the Examiner's rejections, opting instead to file those claims as part of a continuation application and reserving the right to argue for the allowance of those claims at a later time. *See* Hearing Transcript pp.274-78.

117.   Because the references cited by Union Rich fail to contain so many of the limitations of the '992 and '104 patents as listed above, Union Rich cannot demonstrate by clear and convincing evidence that any of the inventions disclose in the claims of either patent would have been obvious to one skilled in the art. Again, all Union Rich offered at the evidentiary hearing was attorney argument— not evidence.

118.   Union Rich offered no evidence that a person of ordinary skill in the art would have looked, for example, to a "Bingo Tote Bag" (Christman) or a "combination Camera Bag" (Baum) or an "insulated Bag [Cooler])" when designing a soft-sided tool bag.

119.   Union Rich has impermissibly reconstructed through hindsight the claimed inventions by plucking features from various references that are not even in the same field and cobble together an argument that a person having ordinary skill in the art would combine these various features to arrive at the claimed

invention.  Union Rich has not provided any evidence that "the subject matter as a whole" would have been obvious at the time the invention was made.

120.   Evidence of secondary considerations in this case weighs against a finding of obviousness.

121.   Travel Caddy's commercial embodiments of the patents in suit had immediate commercial success in the marketplace.  *See* Hearing Transcript p. 160.

122.   In the first year of each of the plumber's tote and electrician's bag, Travel Caddy sold 2-3 times the amount of product for a typical successful product introduction.  *See* Hearing Transcript p. 173; DTX 162.

123.   Travel Caddy's introduction of its Plumber's Tote and Electrician's Bag both satisfied a long-felt need for the invention and represents a failure of others to solve the problem addressed by these bags because these bags created a new soft-sided tool bag category in the marketplace.  *See* Hearing Transcript pp. 163-64.

124.   Previous products available in the market were one size fits all.  By contrast, the patented products were designed to hold specific tools and for easy accessibility of tools.  *See* Hearing Transcript pp. 174-75.  These products also provided a lighter, yet durable product able to withstand the rigors of the work place.  *Id.*

125.   Union Rich's ongoing infringement is causing other infringers to enter the market and duplicate Travel Caddy's patented products.   *See e.g.*, www.alibaba.com – sourcing website; *see also* Hearing Transcript p. 164, p. 167.

126.   Contrary to Union Rich's arguments, Travel Caddy does not allege that Union Rich's bags contribute to Travel Caddy's success in selling its patented products.   Likewise, Union Rich's assertions to the contrary, there is no evidence that Travel Caddy's bags are not covered by the relevant claims of the patent— these bags were not at issue in this case.

127.   Furthermore, Union Rich has provided no evidence to indicate that Travel Caddy's success selling its patented bags was due to its relationship with Rooster.   What is more, if Union Rich really believed this argument had merit, it could have asked Ms. Kathy Curtin about this when she was available as a witness on the stand.   Moreover, not only has Travel Caddy never attempted to measure success by how well Travel Caddy's bags have performed in "head-to-head" competition with Union Rich bags (Hearing Transcript p. 177), any comparison is irrelevant because Union Rich's bags are irrelevant to any determination of the amount of success Travel Caddy's bags have enjoyed in the marketplace.   *See Bayer AG v. Sony Electronics, Inc.*, 229 F.Supp. 332, 356 (D. Del. 2002) (because the court found that the accused devices did not infringe the patent, the evidence

pertaining to sales of the accused devices was irrelevant to the issue of commercial success.).

128.   Any dispute between Olympia Tools International, Inc. and Travel Caddy has been resolved and Olympia Tools has withdrawn its claims.   *See* Olympia Tools International, Inc. v. Travel Caddy, Inc., d/b/a Travelon, USDC C.D.CA 2:08-cv-00121-GHK-SS, Notice of Voluntary Dismissal, Ct. Dkt. No. 8, March 28, 2008.

## 35 U.S.C. §§ 112, 102(B), 102(F).

129.   The '104 patent is not invalid under 35 U.S.C. §§ 112, 102(b), or 102(f).   Because these issues are directly related to Union Rich's inequitable conduct claims, please *see* Paragraphs 68-91, *supra*, for discussion.

## <u>CONCLUSIONS OF LAW</u>

130.   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1338(a).

131.   Venue in this judicial district is proper under 28 U.S.C. §§ 1391(b), (c), (d) and 1400(b).

132.   This Court has personal jurisdiction over Union Rich, Union Rich Plastic Factory, Bonaka Plastic and Bonaka Limited because they are doing business in Georgia and in this judicial district.

## VI.   <u>ENFORCEABILITY OF THE PATENTS IN SUIT</u>

133.   One who alleges inequitable conduct must "provide <u>*clear and convincing evidence*</u> of (1) affirmative misrepresentations of a material fact, failure to disclose material information, or submission of false material information and (2) an intent to deceive." *Impax Labs., Inc. v. Aventis Pharms. Inc.*, 468 F.3d 1366, 1374 (Fed. Cir. 2006) (emphasis added).

134.   The patentee may rebut this by a showing that "the prior art or information was not material," or "that applicant's failure to disclose art or information did not result from an intent to mislead the PTO." *FMC Corp. v. Manitowoc Co.*, 835 F.2d 1411, 1415 (Fed. Cir. 1987).

135.  Additionally, because of its equitable underpinnings the court must "balance the equities to determine whether the patentee has committed inequitable conduct that warrants holding the patent unenforceable." *Impax Labs.*, 468 F.3d at 1375 (citations omitted).  In other words, even threshold findings of materiality and intent to deceive do not compel a conclusion of inequitable conduct.  *See Hoffmann-La Roche, Inc. v. Promega Corp.*, 323 F.3d 1354, 1372 (Fed. Cir. 2003) (vacating district court's judgment of inequitable conduct because the district court failed to perform the "important step in the judicial resolution of inequitable conduct claims" of determining "whether the material misrepresentations or omissions in question are sufficiently serious . . . under all the circumstances, to warrant the severe sanction of holding the patent unenforceable").

136.  Rather, "the involved conduct, viewed in light of all the evidence, *including evidence indicative of good faith*, must indicate sufficient culpability to require a finding of intent to deceive."  *Kingsdown Med. Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 876 (Fed. Cir. 1998) (partially *en banc*).

137. Under the "reasonable examiner" standard, an omission or misstatement is material only "if 'a reasonable examiner would have considered such prior art important in deciding whether to allow the parent [sic] application.'" *Impax Labs.*, 468 F.3d at 1374.

138.   Under the narrower amended Rule 56 standard, information is material when it is not cumulative and it either (1) establishes a prima facie case of unpatentability of a claim, or (2) refutes or is inconsistent with a position taken by the applicant during the prosecution of the patent.  *Id.*

139.   The Federal Circuit recognizes that "'materiality does not presume intent, which is a separate and essential component of inequitable conduct.'"  *Old Town Canoe Co. v. Confluence Holdings Corp.*, 448 F.3d 1309, 1322 (Fed. Cir. 2006) (citation omitted).  Because it is a separate component, the court need not address materiality if the accused infringer cannot establish intent.  *See Kingsdown Med.*, 863 F.2d at 872 n.5.

140.   To show intent, "'the involved conduct, viewed in light of all the evidence, including evidence indicative of good faith, must indicate sufficient culpability to require a finding of intent to deceive.'"  *Impax Labs.*, 468 F.3d at 1374–75 (quoting *Kingsdown Med.*, 863 F.2d at 876 (partially *en banc*)).

141.   An intent to deceive should not, and cannot, be inferred simply because information was not disclosed.  Accordingly, a factual basis is required before there can be a finding of deceptive intent.  *Catalina Lighting, Inc. v. Lamps Plus, Inc.*, 295 F.3d 1277, 1289 (Fed. Cir. 2002); *see also Upjohn Co. v. Mova Pharm. Corp.*, 225 F.3d 1306, 1312 (Fed. Cir. 2000).

142.   Indeed, "[w]ithout a factual basis to establish a threshold level of deceitful intent, the inequitable conduct analysis is at an end."   *Akron Polymer Container Corp. v. Exxel Container, Inc.*, 148 F.3d 1380, 1384 (Fed. Cir. 1998).

## DISCLOSURE OF LITIGATION

143.   The mere initiation of a declaratory judgment action, in which at all relevant times, there were no invalidity, unenforceability or claim construction arguments, is not related to patentability.

144.   The mere initiation of a declaratory judgment action, in which at all relevant times, there were no invalidity, unenforceability or claim construction arguments, is not material information.

145.   Under the reasonable examiner standard, without the possibility of showing that any validity arguments or claim term disputes were at issue prior to the allowance of the '104 patent, Union Rich is unable to begin to meet its burden to show that the mere existence of this litigation would have been material information to an examiner.

146.   Likewise, under the Amended Rule 56 standard, Union Rich cannot demonstrate that the mere existence of this infringement declaratory judgment action, without allegations of patent invalidity or unenforceability, was information

that "establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim . . . ." *See* 37 C.F.R. § 1.56(b) (2006).

147.   "It is the 'material information' and not the mere existence of a lawsuit that needs to be brought to the attention of the examiner with regard to related litigation." *Golden Valley Microwave Foods, Inc. v. Weaver Popcorn Co.*, 837 F.Supp. 1444, 1477 (N.D. Ind. 1992).

148.   The Federal Circuit has confirmed that the existence of litigation is *not* "*per se* material."   At no time did the court in *Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*, 120 F.3d 1253 (Fed. Cir. 1997) hold that the existence of litigation is *always* material information that need be disclosed. Indeed, the court's analysis is to the contrary, and suggests that litigation is not always material.  In *Critikon* the Federal Circuit stated, "[t]he district court *did not consider* whether the litigation relating to the [ ] patents was material to the [ ] reissue proceedings." *Critikon*, 120 F.3d at 1258 (emphasis added).  Certainly, if the mere existence of litigation was always material information, there would be nothing for the district court to have "consider[ed]."  Nor would there have been a need for the Federal Circuit in *Critikon* to explain why it determined on appeal that the related litigation at issue in that case was material information ripe for disclosure.  *Critikon*, 120 F.3d at 1256. Thus, the court in *Critikon* in no way

48

announced that the existence of related litigation is always material information or, *a fortiori*, that the MPEP mandates such a conclusion.

149.   Importantly, while the district court in *Nilssen v. Osram Sylvania, Inc.* may have used the term "*per se*", the Federal Circuit on appeal <u>*never*</u> used this language.  *See Nilssen v. Osram Sylvania, Inc.*, 504 F.3d 1223, 1234 (Fed. Cir. 2007).   Although the Federal Circuit affirmed, it affirmed the district court's judgment and not the individual statements made by the district court in its opinion.   *See Szemraj v. Principi*, 357 F.3d 1370. (Fed. Cir. 2004) ("we sit to review judgments, not opinions").

150.   The context of the subsection of the MPEP to which Union Rich points is also consistent with the conclusion of no materiality based on the mere existence of a lawsuit in which there are no allegations of invalidity or unenforceability.

151.   The MPEP is, of course, not law.  *Kothmann Enters. Inc. v. Trinity Indus., Inc.*, 455 F.Supp.2d 608, 626 (S.D. Tex. 2006).   Subsection 2001.06(c) is entitled "Information *From Related* Litigation."   MPEP § 2001.06(c) (emphasis added).   This subsection plainly is calling for information <u>***from***</u> related litigation. Material information from litigation that relates to patentability, validity or enforceability is squarely *related* to the examination of the application at the Patent

Office. The mere existence of patent litigation, without allegations of patentability,

invalidity or unenforceability is not "*related*" to the examination of the application.

152.   The MPEP specifically states that "[i]t is desirable to ***avoid*** the

submission of long lists of documents if it can be avoided."   MPEP § 2004, Item

13 (emphasis added).   Thus, the Patent Office discourages providing information

that is not plainly material to examination.

153.   Courts that have found related litigation to be material or highly

material information have done so where specific claim terms at issue in the

litigation were also at issue in the application before the Patent Office, or where

invalidity or unenforceability were actually raised by the accused infringer in the

related litigation. *See ICU Med., Inc. v. B. Braun Med., Inc.*, No. 01-3202, 2005

WL 588341, at *14–15 (N.D. Cal. Mar. 14, 2005) (finding that because *the court*

*had already rendered claim constructions* of similar language in earlier patents and

*because there were contentions of invalidity and inequitable conduct*, related

litigation was material.).[1]

---

[1] *See also Nilssen v. Osram Sylvania, Inc.*, 504 F.3d 1223, 1234 (Fed. Cir. 2007)
(noting that the accused infringer had asserted "generalized allegations of
invalidity" in the related litigation); *Critikon*, 120 F.3d at 1258 (accusations of
patent invalidity and inequitable conduct were asserted by the accused infringer in
the related litigation); *Mallinckrodt, Inc. v. Masimo Corp.*, No. 04-1495, 2005 WL
2139867, at *24 (Fed. Cir. Sept. 7, 2005) (concluding that related litigation was

154.   Because the facts demonstrate that invalidity and unenforceability were not at issue in this case until well after the '104 patent issued, Union Rich has failed to meet its burden of providing clear and convincing evidence of materiality. Consequently, Union Rich did not demonstrate inequitable conduct regarding the disclosure of related litigation.

155.   "[I]nequitable conduct requires *not intent to withhold*, but rather *intent to deceive*." *Dayco Prods., Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1367 (Fed. Cir. 2003) (emphasis added).

156.   "It is not inequitable conduct to omit telling the patent examiner information that the applicant in good faith believes is not material to patentability." *Allied Colloids Inc. v. Am. Cyanamid Co.*, 64 F.3d 1570, 1578 (Fed. Cir. 1995); *see also Speedplay, Inc. v. Bebop, Inc.*, 211 F.3d 1245, 1259 (Fed. Cir. 2000) (affirming district court's finding of no inequitable conduct noting that even though those accused of inequitable conduct "admitted familiarity with

---

"highly material" because the patentee "was pursuing an amendment before the PTO that would add to the '830 patent *exactly those terms* being disputed in the '642 litigation." (emphasis added) (citations omitted)); *Dri Mark Prods., Inc. v. Wilpak Indus., Inc.*, No. 04-696, 2006 WL 2882565, at *19–20 (E.D.N.Y. Oct. 6, 2006) (finding that failure of patentee to disclose to the PTO a *decision already rendered in a related litigation* in which the *court had actually construed similar claims* was material but recommending denial of summary judgment because issues of fact concerning whether there was any intent to deceive).

much of the prior art cited by Bebop, they contended that the prior art was not material. The trial judge credited their testimony regarding their opinions of the prior art . . . .").

157. Union Rich's "should have known" argument is the incorrect standard.  In *FMC Corp.*, the court discussed a "should have known of materiality" type standard when it explained the law in a different context.  There, the Federal Circuit explained that the law will not tolerate an applicant who is aware of information, but intentionally buries its head in the sand to avoid learning that that information is material.  *FMC Corp. v. Manitowoc Co.*, 835 F.2d 1411, 1415 (Fed. Cir. 1987).

158.  In this case, Mr. Nelson did not bury his head in the sand concerning the materiality of the information learned from Union Rich.  Mr. Nelson believed that, based on his regular practice, he would have considered whether to inform the Patent Office of the existence of the litigation, during the pendency of the '104 patent application.  Based on Union Rich's repeated communications that the case related solely to non-infringement, and not invalidity, there was no reason for Mr. Nelson to disclose the existence of the litigation to the Patent Office.

159.  Mr. Nelson's attempts to elicit information and prior art from Union Rich further demonstrate that he was acting in good faith and with a mind toward

disclosure of material information to the Patent Office during the prosecution of the '104 patent.

160.   Accordingly, Travel Caddy had no intent to deceive the Patent and Trademark Office regarding the pending litigation.

161.   Union Rich has not met its burden of demonstrating by clear and convincing evidence that Travel Caddy had an intent to deceive. Accordingly, the Court finds there was no inequitable conduct with regard to Union Rich's claim of failure to disclose the litigation.

**Disclosure of Prior Art**

162.   Because of their differences from the '992 and '104 patents, the Ziff patent and the '687 patent are not material under either the "reasonable examiner" standard or the amended Rule 56 standard.   Neither reference would have been important to a reasonable examiner nor would they have established a *prima facie* case of unpatentability of any of the claims.  *See Impax Labs.*, 468 F.3d at 1374.

163.   Because the Ziff and '687 references are immaterial under either the "reasonable examiner" standard or the narrower amended Rule 56 standard, Union Rich's claim of inequitable conduct for failure to submit them to the Patent Office fails.

164.   In proposing new rules regarding the filing of Information Disclosure Statements in the Patent Office, the Patent Office has emphasized that only material references should be submitted to the Patent Office.  *See* Federal Register / Vol. 71, No. 131/ July 10, 2006/Proposed Rules, p. 38809, *available at* http://www.uspto.gov/web/offices/com/sol/notices/71fr38808.pdf.   The Patent Office has further noted that "[i]f an applicant presents cumulative information, review of such information would waste examiner resources."  *Id.* at p. 38810.

165.   Therefore, a reference cannot be considered material if it is "'simply cumulative to other references,' *i.e.,* if the reference teaches no more than what a reasonable examiner would consider to be taught by the prior art already before the PTO."  *Regents of the Univ. of Cal. v. Eli Lilly & Co.*, 119 F.3d 1559, 1574–75 (Fed. Cir. 1997) (reversing a district court's finding of materiality and intent).

166.   Any common features the '687 patent and Ziff may have shared with the claims of the '104 patent and the '992 patent were already contained in other prior art cited by the Examiner.

167.   Because the Ziff patent and the '687 patent are cumulative with the references that the Examiner considered during the prosecution of the '992 and '104 patents, as described above, the Court concludes the references are not material.

54

168.   Union Rich must also prove by clear and convincing evidence that Travel Caddy had "actual knowledge" of the Ziff reference—or any reference for that matter—during the prosecution of the patents in question to show an intent to deceive.  *See Nordberg, Inc. v. Telsmith, Inc.*, 82 F.3d 394, 397 (Fed. Cir. 1996) ("the applicant's *actual* knowledge of the reference's existence must be proved." (emphasis in original)).

169.   "Actual knowledge" "means a present, *conscious* awareness, i.e., 'the duty [to disclose] applies to contemporaneously or presently known information.'" *Union Oil Company of California v. Atlantic Richfield Co.*, 34 F.Supp.2d 1208, 1212 (C.D. Cal. 1998) (emphasis in original).

170.   Accordingly, as discussed above, Union Rich has presented no evidence demonstrating Travel Caddy had a present conscious awareness of Ziff, Hoover, or the '687 patent during the pendency of the  '992 or '104 patent applications.  Thus, Union Rich is unable to show that Travel Caddy had an intent to deceive the Patent and Trademark Office.

171.   Union Rich argues that an adverse inference should be applied against Travel Caddy because Mr. Redzisz was not called as a witness at trial.  This is not the law, and the cases cited by Union Rich are inapplicable to the facts here.

172. Travel Caddy did not "fail to produce" Mr. Redzisz as a witness. To the contrary, Travel Caddy brought Mr. Redzisz to the U.S. from China for a deposition; a deposition that the Court ordered, and for which Union Rich paid. It was Union Rich who chose not to take that deposition. It was Union Rich who chose not to learn the information that Travel Caddy made available through Mr. Redzisz. Union Rich cannot knowingly decide not to examine evidence Travel Caddy provided, and then argue that Union Rich's decision raises an adverse inference against Travel Caddy about the evidence Travel Caddy provided. *See Padilla v. Olympic Airways*, 765 F. Supp. 835, 838 n.2 (S.D.N.Y. 1991) (finding adverse inference not warranted where party arguing for inference never attempted to take depositions of witnesses and the other party indicated it was willing to produce the witnesses); *Kilburn v. U.S.*, 938 F.2d 666, 675 (6th Cir. 1991) (rejecting argument that adverse inference should be applied because the witness' testimony "would have been cumulative . . . and nothing prevented plaintiff's counsel from taking his deposition which could have been used at trial.").

173. Moreover, Union Rich has no basis for its belief that Mr. Redzisz has any knowledge relevant to this issue. Indeed, Mr. Nelson not only testified that he had not seen Ziff until after the '104 patent issued (See Hearing Transcript pp. 265-68), but that it would have been unlikely that he would have sent Travel Caddy,

much less Mr. Redzisz, references that were merely cited but not relied upon by the Examiner—such as Ziff.  *See* Hearing Transcript p. 267.

## SMALL ENTITY STATUS

174.   A small entity is defined as a person, a small business concern, or a nonprofit organization.  37. C.F.R. § 1.27(a).  A small business concern is any business that "(i) has not assigned, granted, conveyed, or licensed . . . any rights in the invention to any . . . [entity] which would not qualify for small entity status . . . and (ii) meets the size standards set forth in 13 CFR 121.801 through 121.805 to be eligible for reduced patent fees."[2]  37 C.F.R. § 1.27(a)(2).

175.   The distribution agreement between Travel Caddy and Rooster is not an exclusive license agreement.  *See* Order, Ct. Dkt. No. 392, p. 15, March 27, 2007.

176.   "The agreement between Travel Caddy and Rooster does no appear to provide Rooster with a divisible patent right."  *See id.*  at 15.  Rooster does not have the right to exclude anyone from making, using, selling, offering to sell, or importing products covered by the '992 or '104 patents.  PX 25.

---

[2] 13 C.F.R. § 121.802 states that a small business concern is one "whose number of employees, including affiliates, does not exceed 500 persons."  13 C.F.R. § 121.802.

177.   The Court interpreted the agreement between Travel Caddy and Rooster as an agreement whereby "Rooster purchases patented products from Travel Caddy and then resells the products." *Id.*  The Court thus previously held that "Rooster is not an exclusive licensee of a divisible patent right of the patents-in-suit." *Id.* at p. 17.

178.   At the most, as a distributor of Travel Caddy's products, Travel Caddy granted Rooster an implied license to resell its products.  The MPEP also explicitly states that, "[i]mplied licenses to use and resell patented articles purchased from a small entity . . . will not preclude the proper claiming of small entity status." *See* MPEP § 509.02(v).

179.   Because Travel Caddy has not licensed any rights in the patents-in-suit to Rooster and because Travel Caddy has less than 500 employees, Travel Caddy has properly claimed small entity status with respect to the '992 and '104 patents.

180.   Accordingly, Union Rich's inequitable conduct claim based on false declarations of small entity status fails.

**Remaining Allegations**

181.   Union Rich has provided no evidence to indicate that Mr. Redzisz was not the inventor of the inventions shown in FIGs. 10 and 11 of the '992 patent.

The drawings themselves demonstrate that he was in possession of this subject matter at least at the time of the filing of the '992 patent.  Likewise, Union Rich has failed to provide any evidence indicating that any person other than Mr. Redzisz invented the subject matter disclosed in the '992 and '104 patents. Therefore, Union Rich's claims of fraudulent claim of invention and execution of the patent declaration fail.

182.   Claims found in a continuation patent are entitled to the filing date of an earlier-filed parent application under 35 U.S.C. § 120 if, *inter alia*, the disclosure in the earlier filed application contains an adequate written description of the invention.  *Lampi Corp. v. Am. Power Prods., Inc.*, 228 F.3d 1365, 1377 (Fed. Cir. 2000).

183.   Union Rich bears the heavy burden of proving invalidity under 35 U.S.C. §112 by clear and convincing evidence.  *See Robotic Vision Sys., Inc.*, 189 F.3d at 1377.

184.   Section 112 contains two paragraphs.  Turning to the first paragraph, § 112 ¶ 1 states:

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly

connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

35 U.S.C. § 112 ¶ 1.

185.   The question of whether the subject matter of a patent claim fails to meet the written description requirement under § 112 is a question of fact.   *All Dental Prodx, LLC v. Advantage Dental Products, Inc.*, 309 F.3d 774, 778 (Fed. Cir. 2002).

186.   "A person shall be entitled to a patent unless . . . (f) he did not himself invent the subject matter sought to be patented . . . ."   35 U.S.C. § 102(f).

187.   "A person shall be entitled to a patent unless . . . (b) the invention was . . . in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States . . . ."   35 U.S.C. § 102(b). Section 102(b) is a statutory bar that acts to prevent a patentee from obtaining a patent if the invention was on sale more than one year (known as the "critical date") before the filing date of the patent application.   Thus, as long as the application is filed within one year of the first instance of the invention being commercially exploited, 102(b) will not act to preclude the right to a patent. Because a continuation patent claims priority to a parent application's filing date,

the continuation patent is likewise entitled to the critical one year date of the parent patent for purposes of 102(b).

188.   Union Rich argues that the "bridging element" as claimed in the '104 patent is not supported by the '992 specification.  The Court has not yet construed the claims and Travel Caddy has not yet offered its interpretation of the claim terms.  *See Rockwell Int'l Corp. v. United States*, 147 F.3d 1358, 1362 (Fed. Cir. 1998) (It is well-established that the first step in any validity analysis is to construe the claims of the invention to determine the subject matter for which patent protection is sought).  Union Rich claims the term "fitted over at least a part of," means "up to entirely around" even though this Court did not address this term during claim construction.   In any event, Union Rich has failed to prove that written description support is lacking under ***any*** construction.

189.   To comply with the written description requirement, "the specification 'need not describe the claimed subject matter in exactly the same terms as used in the claims; it must simply indicate to persons skilled in the art that as of the [filing] date the applicant had invented what is now claimed.'"   *All Dental Prodx, LLC*, 309 F.3d at 779 (citation and quotations omitted).  Even if the specification fails to specifically mention a limitation that later appears in the claims, it is not fatal to the validity of the claims if one skilled in the art would recognize upon reading the

specification that the new language reflects what the specification shows has been invented.  *Id*.

190.   "[A]n applicant is not required to describe in the specification every conceivable and possible future embodiment of his invention."  *Cordis Corp. v. Medtronic AVE, Inc.*, 339 F.3d 1352, 1365 (Fed. Cir. 2003).

191.   In *Lampi*, the Federal Circuit affirmed a finding of no invalidity based on the written description requirement and 35 U.S.C. § 102(b) where the accused infringer, like Union Rich, tried to argue that claims in a continuation child patent were not supported by the specification of the parent patent and thus, not entitled to the filing date of the parent application.  *Lampi Corp.*, 228 F.3d at 1377-78.  In rejecting the accused infringer's contention, the court noted that identical half-shells were but a preferred embodiment of the invention and that there was nothing to indicate that identical half-shells were critical to the invention.  *Id.*  The court acknowledged that it was "a familiar principle of patent law that a claim need not be limited to a preferred embodiment" and that the "drawings in the patent are merely a 'practical example' of the invention."  *Id.*  The court stated, "[a]lthough the patent drawings show only identical half-shells, . . . *that does not compel the conclusion that the written description of the [parent patent] is so narrowly tailored as to preclude Lampi from claiming non-identical half-shells in the*

*[continuation child patent]*." *Id.* (emphasis added).   Accordingly, the court affirmed the district court's finding of no invalidity. *Id.* (emphasis added).

192.   Similarly, in *Cordis Corp. v. Medtronic AVE, Inc.*, 339 F.3d 1352 (Fed. Cir. 2003), the court rejected an accused infringer's argument that the specification was so narrow as to fail to provide sufficient support for the claims, noting that the disclosed embodiment "was not conveyed as ***critical*** to the invention nor was it described as the only feasible design in the disclosure." *Cordis Corp.*, 339 F.3d at 1365 (emphasis added).   Accordingly, the court stated, "the patent disclosure provides ample support for the breadth of the term; it does not *unambiguously limit* the meaning of the term to the narrower embodiment." *Id.* (emphasis added).

193.   The cases cited by Union Rich (*see* Union Rich's Proposed Findings, Ct. Dkt. No. 478, ¶ 146) of Fact are inapposite because either (1) the patentee had either unambiguously narrowed the specification such that the specification could not support the claims or (2) the art at issue was so unpredictable that disclosure of more embodiments in the specification was necessary to adequately show possession of the invention claimed.   *See In re Curtis*, 254 F.3d 1347, 1352–55 (Fed. Cir. 2004) (finding no support for broader claims when at the time the parent application was filed no one knew that other embodiments were possible and thus,

there was "unpredictability in performance of certain species or subcombinations other than those specifically enumerated"); *Tronzo v. Biomet*, Inc., 156 F.3d 1154, 1159 (Fed. Cir. 1998) (finding lack of support for claims covering element reciting specific shape because the specification specifically distinguished the prior art implementing other shapes as inferior and touted the advantages of the claimed shape); *Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473, 1479–80 (Fed. Cir. 1998) (finding no support in the disclosure for claims placing controls in places other than the console, and noting that the only purpose of having the console at all was to house the controls and thus, the patent disclosure "unambiguously limited the location of the controls to the console"); *Lockwood v. American Airlines, Inc.*, 107 F.3d 1565, 1572 (Fed. Cir. 1997) (noting that in a chain of multiple applications, the continuation patent at issue claimed certain, critical limitations that were simply absent in the parent application); *Vas-Cath, Inc. v. Mahurkar*, 935 F.2d 1555, 1567 (Fed. Cir. 1991) (reversing the district court's summary judgment of invalidity for lack of written description where district court disregarded evidence of what the parent patent disclosure would have conveyed to one of skill in the art).

194.   Union Rich did not provide evidence that the specification would not have reasonably conveyed to one of skill in the art that the patentee was not in

possession of the subject matter claimed in the '104 patent at the time of filing of the '992 patent.  *See Bilstad*, 386 F.3d at 1125–26 (Fed. Cir. 2004) (reversing the United States Patent and Trademark Office Board of Patent Appeals and Interferences based in part on the Board's failure to consider the knowledge of one skilled in the art).  Nor did Union Rich provide any evidence that the specification indicates that the extent to which the bridging elements fit over of the end panels was critical to the invention.  *See Cordis Corp.*, 339 F.3d at 1365.  Union Rich did not meet its burden of proving that there was insufficient support for the claims of the '104 patent in the specification.  *See id*; *Lampi Corp.*, 228 F.3d at 1377–78.

195.  Union Rich's allegations that Travel Caddy supposedly committed inequitable conduct by claiming priority back to a parent patent containing a virtually identical specification fails for a second reason.  In rejecting an accused infringer's similar arguments, the Federal Circuit recognized that "[b]ecause the specifications of the asserted patents and the [parent patent] are largely identical, it was logical for [the patentee] to claim priority to the [parent patent], even if the claims of the asserted patents are not entitled to the earlier priority date of the [parent patent]."  *Purdue Pharma L.P. v. Boehringer Ingelheim GMBH*, 237 F.3d 1359, 1367 (Fed. Cir. 2001).  Thus, the court there declined "to find inequitable conduct in the mere act of claiming priority to an earlier patent where the

specifications, but not the claims, of the later patents are supported by the earlier patent." *Id.*

196.   Therefore, Union Rich cannot meet its burden of proving by clear and convincing evidence that Travel Caddy committed inequitable conduct by claiming priority to the filing date of the '992 patent.  Likewise, Union Rich is unable to provide any evidence that Mr. Redzisz did not invent the subject matter disclosed in either the '992 or '104 patent.

197.   The October 2002 sales of products representing embodiments of the subject matter of the supported claims of the '104 patent were made within one year of the filing date of the '992 patent.   *See* DTX 166 (Purchase Order TC001599); DTX 165 (Packing List and Invoice TC000996).  Accordingly, Union Rich can not meet its burden of showing that the claims in the later filed continuation patent are invalid under § 102(b).  *See Lampi Corp.*, 228 F.3d at 1377-78.

198.   Therefore, because the claims of the '104 patent are entitled to claim priority to at least the '992 patent filing date, Travel Caddy did not need to disclose the October 2002 sales of bags representing embodiments of those claims because they were made within one year of the '992 patent's filing date and thus, were not invalidating events under § 102(b).  *Allied Colloids Inc. v. Am. Cyanamid Co.*, 64

F.3d 1570, 1578 (Fed. Cir. 1995) ("In view of our holding that a public use bar [under 102(b)] is not supportable on the evidence that was adduced, the failure to tell the examiner about this purported bar can not be deemed material and culpable . . . .").

199.   Union Rich has provided no evidence to indicate that anyone other than Mr. Redzisz was the inventor of the subject matter disclosed in either the '992 or the '104 patent.  Therefore, its claims under § 102(f) fail.

## VII.   VALIDITY OF THE PATENTS IN SUIT

200.   Issued patents are afforded "a strong presumption of validity . . . ." *Robotic Vision Sys., Inc. v. View Eng'g, Inc.*, 189 F.3d 1370, 1377 (Fed. Cir. 1999) (citing 35 U.S.C. § 282).

201.   Included within this strong presumption of validity is the presumption of novelty and the presumption of nonobviousness.  *Structural Rubber Prods. Co. v. Park Rubber Co.*, 749 F.2d 707, 714 (Fed. Cir. 1984).

202.   "[T]herefore an accused infringer who raises patent invalidity as a defense bears the burden of showing invalidity by facts supported by clear and convincing evidence." *Id.*

203.   When more than one reference is required to show the unpatentability of the claimed invention, the accused infringer must show invalidity under 35

U.S.C. § 103.  *Continental Can Co. USA, Inc. v. Monsanto Co.*, 948 F.2d 1264, 1267 (Fed. Cir. 1991).

204.  Obviousness under § 103 is a question of law requiring four <u>factual</u> inquiries—the *Graham v. John Deere Co of Kansas City*, 383 U.S. 1 (1966) factors—be made.  *Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 662–64 (Fed. Cir. 2000) (court vacated district court's finding of obviousness, noting that a "district court's failure to base its obviousness inquiry on the explicit findings relating to the *Graham* factors can require that the judgment be vacated and remanded for those findings to be made," and that *Graham* findings are "especially important" where the invention is not technologically complex).

205.  These factors, commonly known as *Graham* factors, include: (1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the claimed invention and the prior art; (4) secondary considerations of nonobviousness (commercial success, long-felt but unresolved needs, failure of others, copying, and unexpected results).  *See Ruiz*, 234 F.3d at 662–64.

206.  The Supreme Court's recent decision in *KSR International Co. v. Teleflex Inc.*, does not support a conclusion of obviousness.  The main import of KSR was to eliminate the "rigid application" of the teaching, suggestion, or

motivation test ("TSM test").  *See Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, __ F.3d __, No. 2007-1223, 2008 WL 834402, at *5 (Fed. Cir. Mar. 31, 2008) (explaining KSR).   As the Federal Circuit recently admonished, however, "a flexible TSM test remains the primary guarantor against a non-statutory hindsight analysis . . . ." *Id.*

207.   Indeed, it is still important to identify a reason that would have prompted a person of ordinary skill in the relevant art to combine the elements found in multiple references in the way the claimed invention did.  *Takeda Chem. Indus., Ltd. v. Alphapharm Pty., Ltd.*, 492 F.3d 1350, 1356–57 (Fed. Cir. 2007).

208.   Again, the '992 and '104 patents carry with them the strong presumption of validity—that they are novel and nonobvious—and the burden of proving otherwise by clear and convincing evidence rests at all times with Union Rich.  *See Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1375 (Fed. Cir. 1986) (the presumption of validity "remains intact and on the challenger throughout the litigation, and the clear and convincing standard does not change").

209.   Because the references cited by Union Rich fail to contain so many of the limitations of the '992 and '104 patents, as described above, Union Rich cannot demonstrate by clear and convincing evidence that any of the inventions disclosed in claims of either patent would have been obvious to one skilled in the art.

210.  As an initial matter, Union Rich's inappropriate attempt to use an office action of a separate, later-filed patent application as support of its obviousness argument is irrelevant and should be accorded no weight.  U.S. Patent Application Serial No. 11/340,261, now the '134 patent has no relevance to Union Rich's defense of invalidity.  A non-final Office Action in a related, but separate patent application provides no support for Union Rich's position.  The Office Action does not purport to pertain to the validity of the '992 or '104 patents, but instead addresses different claims, having differing scope than the claims of the patents-in-suit.

211.  "[E]ach claim in a patent must be considered as defining a separate invention."  *Jones v. Hardy*, 727 F.2d 1524, 1528 (Fed. Cir. 1984).  Therefore, any statements from a patent examiner in a separate application apply to the "inventions" contained in the claims of that application only, not to claims in earlier granted patents.  To that end, the obviousness of one set of application claims would not have any bearing on the obviousness of another set of claims appearing in a separate, issued patent.  Thus, evidence of the Patent Office Action of U.S. Patent Application Serial No. 11/340,261 should be accorded no weight.  Additionally, any argument for the relevance of a non-final, first Office Action from a separate patent application is further belied by the fact that

"[o]verwhelmingly, the first reaction a patent examiner has to an application is a non-final rejection."  Mark A. Lemely & Bhaven N. Sampat, *Is the Patent Office a Rubber Stamp?* Stanford Public Law Working Paper No. 999098, 25 (2007), *available at* http://ssrn.com/abstract=999098; *see also* William James, *Ensuring Broad Claim Coverage After Festo*, 18 No. 5 Computer & Internet Law. 5, 13 (2001) (noting that patent examiners issue first office action rejections in "a significant number of cases, most commonly based on cited prior art").  Indeed, a staggering "86.5% of the PTO's first office actions are non-final rejections." Lemely & Sampat, supra, 25.  It is also, however, typical for the subsequent exchange between examiner and applicant to lead to the allowance of those very claims.  *See id.* ("But the second time appears to be a charm.  After that initial, non-final rejection, a significant number of applications result in patents.").  Here, no such exchange has taken place because the applicant of U.S. Patent Application Serial No. 11/340,261 decided not to pursue further action in prosecuting those claims and reserved the right to refile the same claims in a subsequent continuation application.  Accordingly, evidence of a first office action in a related application is irrelevant.  Moreover, reference to the first office action of a related patent is also irrelevant for a court's determination of invalidity because the standards for reviewing patent claims in the Patent Office differ from the standards used in

courts of law.  Indeed, the Patent Office uses only a preponderance of evidence standard when determining patentability.  *See In re Oetiker*, 977 F.2d 1443, 1445 (Fed. Cir. 1992); MPEP § 2142.  This Court, however, will apply the more onerous clear and convincing standard to the question of invalidity.  Moreover, during patent examination, the pending claims are given their broadest reasonable interpretation consistent with the specification.  *See In re Morris*, 127 F.3d 1048, 1054 (Fed. Cir. 1997).  Applying such a broad standard by the Patent Office helps "promote[ ] the development of the written record before the Patent Office that provides the requisite written notice to the public as to what the applicant claims as the invention."  *Id.*  In contrast, the construction applied by this Court is undoubtedly narrower than the broad construction used by patent examiners who are trying to encourage applicants to give up sought-after patent protection.  *See id.* ("It would be inconsistent with the role assigned to the PTO in issuing a patent to require it to interpret claims in the same manner as judges who, post-issuance, operate under the assumption the patent is valid.").  In view of the Patent Office's lesser burden of showing invalidity of patent claims and the broad construction the Patent Office applies in reviewing patent claims, the irrelevancy of a non-final, first office action issued in a related, but separate patent, is glaring.

212.   "The combination of elements from non-analogous sources, in a manner that reconstructs the applicant's invention only with the benefit of hindsight, is insufficient to present a *prima facie* case of obviousness."  *See In re Oetiker*, 977 F.2d 1443, 1447 (Fed. Cir. 1992).

213.   Simply concluding, without evidence, as Union Rich has done, that a person of ordinary skill in the art would combine various features from such vastly different bags is  classic hindsight reasoning, which is improper to invalidate patent claims.  *See Sensonics, Inc. v. Aerosonic Corp.*, 81 F.3d 1566, 1570 (Fed. Cir. 1996) ("To draw on hindsight knowledge of the patented invention . . . is to use the invention as a template for its own reconstruction-an illogical and inappropriate process by which to determine patentability.").   "One cannot use hindsight reconstruction to pick and choose among isolated disclosures in the prior art to deprecate the claimed invention."  *In re Fine*, 837 F.2d 1071, 1075 (Fed. Cir. 1988).

214.  Union Rich has simply "retraced the path of the inventor with hindsight, discounted the number and complexity of the alternatives, and concluded that the invention . . .  was obvious."  *See Ortho-McNeil*, 2008 WL 834402, at *5.   "Of course, this reasoning is always inappropriate for an obviousness test based on the language of Title 35 that requires the analysis to

examine 'the subject matter as a whole' to ascertain if it '*would have been obvious at the time the invention was made*.'"  *Id.* (citing 35 U.S.C. § 103(a)) (emphasis in original) (affirming finding of that invention was not obvious).

215.   Moreover, Union Rich has ignored its burden of providing evidence of a plausible reason that a person of ordinary skill in the art would combine the references in the manner argued by Union Rich, as required by *KSR*.  *See KSR International Co. v. Teleflex Inc.*, 127 S.Ct. 1727, 1740-41 (2007) (noting that "rejections on obviousness grounds cannot be sustained by mere conclusory statements" and that factfinder must "determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue").

216.   Evidence of secondary considerations is critical to a determination of obviousness.   "In Graham the Supreme Court explained that the public and commercial response to an invention is a factor to be considered in determining obviousness, and is entitled to fair weight."   *Arkie Lures, Inc. v. Gene Larew Tackle, Inc.*, 119 F.3d 953, 957 (Fed. Cir. 1997).  In fact, "evidence of secondary considerations may often be the most probative and cogent evidence in the record," because it "may often establish that an invention appearing to have been obvious in light of the prior art was not."  *Id.*; *see also Ortho-McNeil*, 2008 WL 834402, at *5

("As this court has repeatedly explained, this [secondary] evidence is not just a cumulative or confirmatory part of the obviousness calculus but constitutes independent evidence of nonobviousness.").

217.   Union Rich has not offered anywhere close to clear and convincing evidence that the claims are invalid as being obvious.   Rather, it has offered only unsupported attorney argument.

218.   The Union Rich references clearly do not contain several of the limitations of the claims of the '992 and '104 patents.   Thus, it would have not been obvious to one of skill in the art to have combined such unrelated patents to achieve the inventions disclosed in the '992 and '104 patents.   Accordingly, the claims of the '992 and '104 patents are not obvious.

**35 U.S.C. §§ 112, 102(B), 102(F)**

219.   The '104 patent is not invalid under 35 U.S.C. §§ 112, 102(b), or 102(f).   Because these issues are directly related to Union Rich's inequitable conduct claims, please *see* Paragraphs 181-199, *supra*, for discussion of the law regarding these issues.

## CONCLUSION

220.   Because Union Rich failed to establish with clear and convincing evidence that the '992 and '104 patents are unenforceable due to inequitable

conduct, the Court dismisses with prejudice Union Rich's counterclaim for unenforceability.

221.   Because Union Rich failed to establish with clear and convincing evidence that the '992 and '104 patents are invalid under 35 U.S.C. §§ 102, 103 and 112, the Court dismisses with prejudice Union Rich's counterclaim for invalidity.

Respectfully submitted,


Dated:  April 7, 2008

___/Aimee B. Kolz/_____
Jon O. Nelson
Marc S. Cooperman
Scott A. Burow
Aimee B. Kolz
Banner & Witcoff, Ltd.
10 South Wacker Drive
30th Floor
Chicago, IL 60606
Tel: (312) 463-5000
Fax: (312) 463-5001

G. Melton Mobley, Jr.
Lokey, Mobley and Doyle, LLP
8425 Dunwoody Place
Atlanta, GA 30350
Tel: (770) 640-9441
Fax: (770) 640-6646

Attorneys for Defendants and Counter-Plaintiff

## **CERTIFICATE OF COMPLIANCE**

Pursuant to LR 7.1D, the undersigned counsel hereby certifies that the foregoing complies with the font and point selections approved by the Court in LR 5.1B.  The foregoing memorandum was prepared on a computer using the Times New Roman font (14 point).

    / Aimee B. Kolz /
Aimee B. Kolz
Attorney for Defendants and
Counter-Plaintiff

Banner & Witcoff, Ltd.
10 South Wacker Drive
Suite 3000
Chicago, Illinois  60606
Phone: 312-463-5000

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was filed electronically via CM/ECF in the United States District Court for the Northern District of Georgia, with notice of same being electronically served by the Court, on the following attorneys of record:

> Joel D. Myers
> Ashish D. Patel
> G. Melton Mobley, Jr.
> Jon O. Nelson
> Marc S. Cooperman
> Scott A. Burow
> Aimee B. Kolz

Respectfully submitted this 7th day of April 2008.

                                        / Aimee B. Kolz / _____
                                        Aimee B. Kolz
                                        Attorney for Defendants
                                        and Counter-Plaintiff

Banner & Witcoff, Ltd.
10 South Wacker Drive
Suite 3000
Chicago, Illinois  60606
Phone: 312-463-5000